**Ramon ANDERSEN, Plaintiff,**

v.

**Stuart SCHULMAN et al., Defendants.**

**No. 70 C 2938.**

United States District Court,
N. D. Illinois, E. D.

Dec. 23, 1971.

Paul E. Thompson, Percival Thompson, Chicago, Ill., for plaintiff.

Robert W. Bergstrom, Bergstrom, Rohde, Dahlgren & Olson, Chicago, Ill., for defendants Newsweek, Bruno, and Jones.

Alfred P. Lipton, Mandel & Lipton, Chicago, Ill., for defendants Stuart and Rochelle Schulman.

## MEMORANDUM OPINION

WILL, District Judge.

This diversity jurisdiction action charges the defendants with the tort of malicious prosecution and arises indirectly from the civil disturbances at the time of the 1968 Democratic National Convention that occurred in Lincoln Park in Chicago on the night and morning of August 26 and 27, 1968. The plaintiff is a police officer who was suspended by the Chicago Police Department and indicted by a federal grand jury for his alleged conduct in those disturbances. The defendants include Newsweek, Inc., a national weekly news magazine, Hal Bruno, News Editor of Newsweek at the time of the occurrences involved herein, and James C. Jones, Detroit Bureau Chief for Newsweek who was also in Chicago to cover the convention. These defendants will hereinafter be referred to collectively as the Newsweek defendants. The remaining two defendants, Stuart Schulman and his wife, Rochelle, were also in Lincoln Park at the time in question and allegedly were involved in a physical and verbal altercation with the plaintiff.

The thrust of the plaintiff's complaint is that the Newsweek defendants falsely and maliciously complained by telegram to the Superintendent of Police of the City of Chicago that the plaintiff had assaulted certain Newsweek personnel and falsely and maliciously gave untrue statements to the same effect to the Internal Investigation Division of the Chicago Police Department and to various federal officials. These statements, plaintiff alleges, were given by the defendants who knew of their false content for the purpose of instituting a criminal prosecution of plaintiff for which there was no probable cause. The allegations against the Schulmans are of a similar, though not identical nature. The plaintiff alleges that, as a proximate result of

such statements and charges, he was suspended from his duties as a Chicago Police Officer for a period of nearly one year and was indicted by a federal grand jury, which indictment was subsequently dismissed by the United States Attorney upon his own motion. All defendants presently move for summary judgment contending that no genuine material issue of fact exists as to certain elements necessary to be proven in a suit for malicious prosecution and that the plaintiff's suit must fail as a matter of law.

It is appropriate at this point to review the proceedings in this litigation to date. All the defendants have previously filed motions for summary judgment. In the memorandum opinion accompanying the denial of these motions, the Court discussed the six essential elements which a plaintiff must prove in order to sustain a suit for malicious prosecution and noted that if the plaintiff failed to establish any one element, his suit as a whole must fail. Freides v. Sani-Mode Manufacturing Co., 33 Ill.2d 291, 211 N.E.2d 286 (1965). We concluded that, at the time of the motions, the record before the Court indicated either that a material issue of fact existed as to certain elements of the suit or that the record was not so complete concerning several issues as to facilitate ruling on other elements of the suit. Although the defendants had filed numerous affidavits, the plaintiff had not filed anything other than an affidavit by his attorney that more time was needed for discovery before he could reply to the affidavits of the defendants. We believed that the defendants' motions for summary judgment would not be appropriate until the plaintiff was allowed the time for discovery that he claimed to need. We thus denied the motions for summary judgment, granted the plaintiff an extended period of time for further discovery, and granted the defendants leave to file renewed motions for summary judgment should they later believe such action appropriate. Discovery has now been completed and the motions have been resubmitted based upon a record significantly more complete than on the prior occasion.

## I

One of the elements which must be proved in a suit for malicious prosecution is that of legal causation: the plaintiff must prove that an original criminal or civil judicial proceeding was caused to be initiated by the present defendants against the plaintiff who was the defendant in the original proceedings. Our previous ruling indicated that the federal criminal indictment is the only prosecution at issue in the instant action because the police board inquiry, even if presumed to be a quasi-criminal prosecution, resulted in a finding of guilty against Patrolman Andersen. That inquiry failed to satisfy the requisite for a malicious prosecution suit that the prior criminal action must have terminated in favor of the defendant and cannot, therefore, be a basis for the plaintiff's suit herein. In support of their motions for summary judgment, the defendants assert that the uncontroverted evidence now in the record before the Court establishes that the defendants did not initiate the grand jury proceedings which ultimately led to the plaintiff's indictment or cause them to be initiated.

The affidavits filed by the defendants in support of their current motions outline their contact with state and federal authorities as it relates to Patrolman Andersen's alleged physical abuse of them. The record indicates that the Newsweek defendants never filed any formal complaint against the plaintiff. Rather, they sent a telegram, general in nature, to the Chicago Police Superintendent complaining of the physical mistreatment of reporters by police officers in Lincoln Park. After defendant Jones had been beaten by a police officer, allegedly the plaintiff, defendant Bruno, copied down the name of the alleged aggressor from the officer's nameplate on his uniform. It was not until the day following the alleged occurrences, on August 27, 1968, that the Newsweek defendants identified the plaintiff by

name. This was done when officers from the Internal Investigation Division of the Chicago Police Department came to the local Newsweek offices to confer with the defendants regarding their telegram. The Newsweek defendants upon request cooperated with the police department on subsequent occasions, including testifying at the disciplinary hearing wherein plaintiff was ultimately found guilty of mistreating the defendant Schulman, and also cooperated with the Federal Bureau of Investigation. They, in addition, complied with a subpoena issued by this Court and testified before the federal grand jury which subsequently indicted the plaintiff.

As to the Schulmans' relation to the causation or initiation of the grand jury proceedings, the records and affidavits submitted by those defendants indicate the following. The Schulmans and the plaintiff were involved in a physical and verbal altercation in Lincoln Park, immediately preceding the alleged Jones-Andersen altercation discussed above. Stuart Schulman complained to the police of physical mistreatment by Andersen and gave a statement to them orally on August 27, 1968. On December 11, 1969, he testified at the Police Board inquiry against Andersen and on November 13, 1968, he appeared pursuant to a subpoena before the federal grand jury. Mrs. Schulman's contacts with the authorities are of a similar nature, with the one exception that she was not called to appear before the Police Board inquiry.

As concerns the issue of legal causation, we said in our prior opinion:

The issue of what actions are necessary to be considered as legal causation is unclear, but both parties agree that the Restatement of Torts (First) is a fair statement of the law. Section 653 of the restatement indicates that a person may be considered to have procured the institution of a criminal proceedings if he induces a third person or public prosecutor to initiate such proceedings, but may not be deemed to have procured the proceedings if he merely provides a public official information of another's supposed criminal conduct and the public prosecutor is left with the uncontrolled choice of whether or not to bring the proceedings. We presently have no information in the record concerning the nature of the grand jury proceedings, whether they were instituted to conduct a broad investigation into the conduct of many people or of just a few, and whether they were convened solely on behalf of the United States Government or as a proximate result of complaints of certain individuals such as the defendants herein. Because of these blanks in the present record, we cannot determine the precise nature of the defendants' relationship with these proceedings.

To fill what we believed was a significant gap in the record before us, the defendants have filed the transcript of the proceedings before the Chief Judge of this Court when he impanelled the September, 1968 grand jury, the grand jury at issue herein. This transcript shows conclusively that the grand jury was impanelled to conduct a broad investigation into all phases of the disturbances relating to the Democratic convention, including potential violation of federal law by purported rioters, by police against private citizens, and by the mass media, and was not initiated directly or indirectly by any of the defendants. The transcript also shows that the then United States Attorney for this district informed the Chief Judge that the Attorney General of the United States had been conducting a broad investigation of his own which had not been completed and which to date had covered more than one thousand interviews. The Chief Judge responded to this information by specifically directing the United States Attorney to report all these matters to the grand jury and let it determine who, if anyone, should be presented for indictment for violation of any of the laws of the United States.

The plaintiff presents no affidavits in opposition to those of the defendants.

In fact, he fails even to refer to the issue of legal causation of the grand jury proceedings or the indictment in his memorandum in opposition to the renewed motions for summary judgment. Apparently, he could not proffer any counter-affidavits that would create a genuine and material issue of fact as to the element of legal causation because no information which could be put into such an affidavit exists. The transcript of the impanelling proceedings indicates that not only did the defendants not induce the United States Attorney to initiate the grand jury proceedings which ultimately indicted the plaintiff, but that the prosecutor himself was ordered to turn over to the grand jury all the information which had been gathered independently by the Attorney General of the United States and his agents.

■ The Chief Judge made quite clear his intention that the grand jury was to proceed as it saw fit, not as the United States Attorney might think proper. With this factual background now in the record, it becomes quite obvious that, no matter how willing the defendants may have been to testify before the federal grand jury and no matter how much their actions may have otherwise fitted into the common law definition for liability for malicious prosecution, the defendants cannot be attributed with having legally caused the criminal action against the plaintiff under the rule of law that the parties have agreed is controlling. *Cf.*, Gilbert v. Emmons, 42 Ill. 143 (1886); De Correvant v. Lohman, 84 Ill.App.2d 221, 228 N.E.2d 592 (1st Dist. 1967).

Because the plaintiff has failed to prove the existence of a genuine material issue of fact as to the element of legal causation and because the uncontroverted evidence indicates that the defendants did not legally cause the criminal indictment against the plaintiff, the motions of the defendants for summary judgment must, on this ground alone, be granted.

II

The second ground asserted by the defendants for summary judgment—with regard to the essential element of lack of probable cause for the institution of the prior criminal action—is that there is no genuine issue of material fact and that the evidence affirmatively establishes as a matter of law that the defendants did have probable cause for their testimony. In support of their motions, defendants submit lengthy affidavits and depositions. In opposition to the motions, the plaintiff does not submit any affidavits nor does he request that any depositions or interrogatories be considered in opposition to the defendants' affidavits.

■ Rule 56(e), Fed.R.Civ.P., states that when a motion for summary judgment is made and supported as the defendants have done herein, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. "If he does not so respond, summary judgment, if appropriate, shall be entered against him." The plaintiff, therefore, has the burden to respond to defendants' affidavits by setting forth specific facts showing that there is a genuine issue for trial, Markwell v. General Tire and Rubber Co., 367 F.2d 748, 750 (7th Cir. 1966), with an issue of fact not being deemed genuine within the meaning of Rule 56(e) unless it has legal probative force as to the controlling issues, O'Brien v. McDonald's Corporation, 48 F.R.D. 370 (N.D.Ill. 1970).

■ We recognize that, notwithstanding the plaintiff's surprising failure to submit any affidavits whatsoever, we must nevertheless determine if the defendants have met the burden to show that they are entitled to judgment under established principles of substantive law because the power to grant summary judgment vested in this Court by Rule 56(e) if the nonmoving party fails to file

any affidavits exists only, by the terms of the rule, "when appropriate." See, 6 Moore's Federal Practice ¶¶ 56.22[2], at p. 2825, 56.23, at p. 2854. The averments of fact contained in the defendants' affidavits accompanying their motions will be presumed as true, Americana of Puerto Rico, Inc. v. Kaplus, 240 F.Supp. 854 (D.N.J.1965), aff'd 368 F.2d 431 (3rd Cir. 1966); Preveden v. Croatian Fraternal Union of America, 120 F. Supp. 33, 35 (W.D.Pa.1954), except as to any facts which, from our own independent search of the voluminous record, we find to be contradicted by any sworn statements in the record before us. If, in the absence of affidavits by plaintiff, the record indicates the lack of a triable issue of material fact, the defendants will be entitled to summary judgment if the evidence that they have presented would, if presented at a trial, entitle them to a directed verdict. Wagoner v. Mountain Savings & Loan Ass'n, 311 F.2d 403, 406 (10th Cir. 1962); 6 Moore's Federal Practice ¶ 56.11[3] at p. 2171. Cf. Montoux v. Gulling Auto Electric, Inc., 295 F.2d 573 (7th Cir. 1961).

We must, therefore, review the factual allegations of the defendants in their affidavits and any other related verified allegations from the record as it now stands, all pretrial discovery having been completed. Our review of the defendants' affidavits, their depositions, and the depositions of the plaintiff, plus the exhibits and appendix filed with this and the previous summary judgment motions indicates that no dispute exists as to any of the following facts that relate to the issue of probable cause, except as otherwise noted.

On the night of August 26–27, 1968, at the time of the Democratic National Convention, there were disturbances in Lincoln Park and on Clark Street adjoining the park. On that night, Stuart Schulman and his wife, Rochelle, had left their children with their grandparents, gone to a movie, and afterwards, to a night spot in the "Old Town" area near Lincoln Park, to celebrate their wedding anniversary. Mr. Schulman was Assistant Professor of Economics at Northrup Institute of Technology, Englewood, California, and was visiting his parents in Chicago. Although they had originally ventured a few steps into Lincoln Park after leaving the night spot, they decided to return to their nearby parked car when the crowd and police emerged rather noisily from the park onto Clark Street.

Hal Bruno and James Jones, covering the events in Lincoln Park for Newsweek, had been with the police as they proceeded west across the park, and they arrived on the sidewalk on the east side of Clark Street at about the same time as the Schulmans. The separate attention of all four defendants was attracted by the coercion of a photographer at the curb by another policeman not involved in this action, one Patrolman Blaa. Although the precise order of events is not entirely clear, no one disputes that Blaa was intimidating the photographer and ultimately forced him to yield his exposed film. All four defendants went over to see this incident, Mrs. Schulman lagging behind her husband.

The record is also not precise as to the next sequence of events, although no dispute exists as to the controlling facts. As Mr. Schulman drew close to the photographer and the plaintiff, who was near Patrolman Blaa, the plaintiff hit Mr. Schulman in the head with his club, so that blood ran down his face until he ultimately required six or seven stitches. The Schulmans have testified in all proceedings involving this incident, including before the grand jury, that Mr. Schulman was attempting to get the badge numbers of the patrolmen involved with the photographer when he was clubbed by plaintiff. The plaintiff contended in his deposition that he ordered the Schulmans to leave the park, that Stuart Schulman attempted to assault him, and then, "I struck him, he struck me, I don't recall him falling down," (Pl.Dep. 101), and "I hit him, he hit me, from then on its a blur" (Pl.Dep. 135). It is uncertain whether Mr. Schulman drew back his fist prior to being hit, but no contradiction in the testimony

exists that the plaintiff clubbed Schulman first. Mr. Schulman then punched back at the plaintiff, hitting him in the face mask and twisting his glasses so that thereafter he could not see clearly. Plaintiff then tried to hit Mr. Schulman again, and the latter broke away and ran to the north. The plaintiff, thus, has admitted that he did strike Schulman with his club. The Schulmans have both sworn in their affidavits filed with their summary judgment motions that their testimony before the Internal Investigations Division and the grand jury was correct to the best of their knowledge at the time it was given and that they currently believe their testimony to have been true. The plaintiff does not oppose these sworn statements with any counter-affidavits of his own.

Immediately prior to the Andersen-Schulman scuffle, Bruno and Jones were standing behind Schulman to his north on the sidewalk, which is about five feet wide. Bruno noted down Blaa's name from his nameplate and their attention was distracted from Blaa's action against the photographer to the seizure of a screaming woman in the street by the police. Disagreement exists as to whether that woman was Mrs. Schulman, standing somewhat behind her husband, but this disagreement is immaterial. Whoever the lady was, she caught the attention of Bruno and Jones and they did not witness the Schulman clubbing, although they were conscious of a commotion and noise from his direction.

Mr. Jones' and Mr. Bruno's version of what happened next is as follows. As their attention returned from the screaming woman incident to the Blaa-photographer incident, Jones heard a yell, and a police officer, moving past him at a slow trot, delivered a butt stroke with his club to his ribs and moved on. The blow knocked Jones back several feet and he moved to Bruno's side, out of breath and in pain. Bruno only saw the back of the officer, but when Jones yelled, "I've been hit," and pointed out the officer who hit him, Bruno circled around the officer and copied down the

name "Andersen" from the officer's nameplate.

Bruno sent Jones to shelter and then encountered Deputy Superintendent Parker and Assistant Corporation Counsel Elrod, who had told him to get the names of any policemen using excessive force. Bruno told them that he had names as they had requested, and he then asked them to come back with him right then. They told him instead to give the names to Captain Conrad at Henrotin Hospital.

He did so after driving Jones to the hospital. A Dr. Whiteside, who has filed an affidavit herein, examined Jones, reviewed the injuries, and prescribed medication. Thereafter, at a police line-up, Mr. Jones identified plaintiff as the patrolman who struck him, but Bruno, who had only previously observed the policeman's back and nameplate, was unable to identify him. The above testimony, with only minor variations totally irrelevant to the issues herein (as, for example, Patrolman Blaa's precise orders to the photographer), was given by Bruno and Jones to the Internal Investigation Division, at two police board hearings, at the grand jury proceedings, at depositions in this cause, and was again sworn to in affidavits incorporated in this motion for summary judgment. In those affidavits, the Newsweek defendants assert that their testimony was correct, and that they still believe it to be correct.

We again note that the plaintiff does not contradict these affidavits by counter-affidavits of his own. The record (including the pleadings), reveals that the following are his "statements" as to what occurred. Plaintiff says that he did not see anyone near him within ten feet at the time of his scuffle with Schulman, but admits that photographic evidence in the record establishes that there must have been people on the sidewalk to the north of him. He testified at his deposition that he chased Schulman north for a minimum of ten to fifteen feet on the five foot wide sidewalk with his nightstick drawn in his hand but

that he did not remember seeing anyone although he cannot say for certain that no one was there. He has also stated, however, the obvious reason why he could not have seen anyone: Schulman had knocked his glasses askew.

After the plaintiff clubbed Schulman, the latter hit plaintiff in the face twisting off his glasses. As the plaintiff testified at his deposition, one of the lenses of the eyepiece was knocked loose and became wedged between the frame of the glasses and the face shield of his helmet. As he ran, he was trying, without success, to poke behind the shield to catch the lens. The nose piece was stuck into his skin and twisted at an angle above his eye so that he could not see. The glasses were twisted, the bridge was broken, and the right lens was out and could not be replaced. The plaintiff admitted at his deposition that, after he was hit by Schulman, everything became confused and, further, that he would have had difficulty seeing any person on the sidewalk while he chased Schulman due to his difficulty in focusing his vision.

Even in his report to the Internal Investigation Division, the plaintiff made no categorical denial of hitting Jones. He merely said: "At no time did I knowingly, and certainly not intentionally, strike, jab, pummel or harass any person displaying press credentials." This is the strongest statement that we can find anywhere in the record from the plaintiff as to whether he hit Jones, and it comes with other statements to the effect that he could not see and was confused because of the scuffle he had had with Stuart Schulman.

■ The legal issue relating to probable cause presented by a malicious prosecution suit is whether the defendants had reasonable grounds for suspicion, supported by circumstances sufficiently strong in themselves, to warrant a cautious man in the belief that the person accused was guilty of the offense charged. Palmer v. Richardson, 70 Ill. 544, 546 (1873); Stueber v. Admiral Corporation, 185 F.2d 10 (7th Cir. 1950). The

issue of the guilt or innocence of the defendant in the criminal action is not involved in a malicious prosecution suit. Brandt v. Pennsylvania Railroad Co., 231 F.2d 848 (7th Cir. 1956); Davie v. Wisher, 72 Ill. 262 (1874). Thus, if Messrs. Jones and Bruno were correct in their identification of the plaintiff as the officer who hit Jones and if the Schulmans were correct in their description of the events that led to plaintiff's acknowledged clubbing of Stuart Schulman, or, if they were incorrect but honestly and reasonably believed that they were correct, then there would have been probable cause for the institution of the criminal proceedings (had the defendants instituted the plaintiff's indictment).

■ The sole remaining legal question is whether the probable cause issue must be resolved by the Court or by a jury. In Illinois, this issue is deemed one of mixed fact and law, i. e., where the evidence that surrounds the issue of probable cause is undisputed, the determination of whether probable cause existed for the institution of the proceedings is one of law for the Court to decide; where the facts relied upon as showing probable cause are controverted, and the evidence as to their existence is conflicting, the factual matters must be settled by the verdict of the jury before the Court may apply the controlling legal principles to them. Schattgen v. Holnback, 149 Ill. 646, 652, 36 N.E. 969, 970 (1894); Stueber v. Admiral Corporation, supra; Brandt v. Pennsylvania Railroad Co., supra.

■ With this concept of the issue of probable cause in mind, we conclude on the record presented to us, which is largely undisputed, that the defendants did indeed possess probable cause for their "institution" of the criminal charges against the plaintiff. Because the defendants have sworn in their affidavits that the facts that they have testified to all along are correct and since the plaintiff does not controvert these statements, no factual issue is presented to the Court.

It is obvious that, if plaintiff did the things the defendants attribute to him, they conclusively possessed probable cause for their "institution" of the actions against him. Similarly, if they reasonably believed he did, no basis for a malicious prosecution suit is present.

When the record is viewed as a whole, even overlooking the plaintiff's glaring failure to submit any counter-affidavits and his obvious reliance solely upon the unsworn allegations of his complaint, no factual dispute as to the controlling legal issues is apparent. The plaintiff has never denied that he hit Jones, but merely has said that he does not remember doing so. And although the plaintiff contends that he was merely responding to Stuart Schulman's failure to leave the park upon being requested to do so and raising his fist, the plaintiff has admitted that he did, indeed, club Schulman. Thus, even if the issue were the plaintiff's guilt or innocence of the charges asserted against him (which it is not), he has failed to raise any material factual dispute. And when the issue is properly viewed as involving only the question of whether the defendants had reasonable grounds for concluding that the plaintiff had committed the actions they attribute to him, it is clear that no material factual issue exists to submit to the jury.

As the defendants have asserted in uncontroverted affidavits that their statements to the Internal Investigation Division and their testimony before the police board inquiry and the federal grand jury were factually correct and that they believed them to be correct both at that time and now, and as the plaintiff has failed to raise any contested issue of fact, material or otherwise, it is clear that the defendants, as a matter of law, possessed probable cause for their participation in the criminal prosecution against the plaintiff. For this reason as well, the plaintiff's suit for malicious prosecution must fail and the defendants' motions for summary judgment must be granted.