DREXEL, Rose Marie, Administratrix of the Estate of Drexel, Edward H., Sr., deceased and Drexel, Rose Marie in her own right, Appellant,

v.

UNION PRESCRIPTION CENTERS, INC., Appellee.

No. 77-1620.

United States Court of Appeals, Third Circuit.

Argued Jan. 10, 1978.

Decided Aug. 11, 1978.

franchisee. Accordingly, we will reverse the judgment of the district court and remand the case for further proceedings.

## I. FACTS

According to the complaint, plaintiff's husband, the decedent, had been given a prescription for the drug "Aldactone" which was properly filled on March 3, 1975, by Union Prescription Center, a retail drugstore located in Reading, Pennsylvania. On April 14, 1975, decedent returned to the same drugstore to have the prescription refilled. This time, however, decedent received not "Aldactone," a diuretic, but "Coumadin," a blood thinner. As a result of taking "Coumadin," decedent sustained massive traumatic injuries from which he died on May 12, 1975.

Plaintiff, appellant herein, instituted this diversity action[1] for damages under the Pennsylvania wrongful death and survival statutes[2] against defendant-appellee Union Prescription Centers, Inc. (UPC). The complaint, which charged UPC with "negligence and carelessness and malpractice" in improperly refilling the prescription, alleged that UPC was "the owner, operator, possessor and in control" of the Reading drugstore and that "[a]ll of the acts alleged to have been done or not to have been done by defendant were done or not done by defendant, its agents, servants, workmen, and/or employees, acting in the course and scope of their employment with and on behalf" of UPC.

Edward F. Silva, Jack E. Feinberg, Feinberg, Deutsch, Felgoise, McErlean & Moldovsky, Philadelphia, Pa., for appellant.

Robert F. Rossiter, Joseph R. Davison, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for appellee.

Before ADAMS, BIGGS and WEIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

This is an appeal, pursuant to 28 U.S.C. § 1291, from a final order of the United States District Court for the Eastern District of Pennsylvania, dated March 23, 1977, granting appellee's motion for summary judgment. The case presents difficult questions concerning the liability of a franchisor for the allegedly negligent acts of its franchisee. After a careful examination of the record, we conclude that unresolved issues of material fact exist as to both a real and an apparent master-servant or agency relationship between the franchisor and the

■ UPC filed a motion for summary judgment which stated, *inter alia,* that on October 15, 1974, UPC has entered into a franchise agreement with Joseph J. Todisco, Jr., whereby Todisco purchased from UPC the right to acquire and operate the Union Prescription Center in Reading; that UPC "was not at any time material to plaintiff's cause of action, the owner, operator, possessor, or in control" of the Reading store;

**1.** The complaint alleged that plaintiff is a citizen of Pennsylvania, that defendant Union Prescription Centers, Inc., is a Delaware corporation with its principal place of business in Wisconsin, and that the amount in controversy exceeds $10,000.

**2.** Pa.Stat.Ann. tit. 12, §§ 1601 *et seq.* (Purdon); 20 Pa.Cons.Stat.Ann. §§ 3371 *et seq.* (Purdon).

that UPC had never supplied or sold any drugs or medication to the Reading store; that Todisco, acting as an "independent contractor," was not "an agent, servant, workman, and/or employee" of UPC; and that therefore defendant was not in a position whereby a duty of due care was owed plaintiff's decedent. A copy of the Franchise Agreement was attached as an exhibit to UPC's motion.[3] Subsequently, in support of its motion for summary judgment, UPC submitted affidavits signed by Todisco, the franchisee, and by James B. Young, Esquire, corporate counsel for UPC.[4] In opposing the motion for summary judgment, plaintiff submitted the deposition of Todisco, but filed no countervailing affidavits. On the basis of that record, the district court granted summary judgment for UPC in a written opinion, 428 F.Supp. 663 (E.D. Pa.1977), and this appeal followed.

## II. VICARIOUS LIABILITY

Appellant contended in the district court and asserts on appeal that UPC is vicariously liable for Todisco's alleged negligence either because UPC retained sufficient control over the operation of the Reading drugstore to establish a master-servant relationship or because UPC "held itself out" to the public as the owner or operator of the Reading store. We shall examine these theories in turn. In so doing, we heed the well-established principles that the moving

party in a motion for summary judgment must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, Rule 56(c), Fed.R.Civ.P., 28 U.S.C.; *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), and that the evidence and the inferences drawn therefrom must be considered in a light most favorable to the party opposing the summary judgment motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir. 1972); *Long v. Parker,* 390 F.2d 816, 821 (3d Cir. 1968), *vacated on other grounds,* 384 U.S. 32, 86 S.Ct. 1285, 16 L.Ed.2d 333 (1969).

Although it apparently was never questioned in the district court proceedings that Pennsylvania substantive law was to be applied in this diversity case, *see Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964), both parties, at the request of this court, submitted additional briefs regarding a potential conflict-of-laws issue. As discussed *infra,* one of plaintiff's contentions is that a master-servant relationship existed between UPC and its franchisee as evidenced by the terms of the Franchise

---

3. A copy of the Franchise Agreement is attached as an Appendix to this opinion.

4. These affidavits were filed with the district court on August 2, 1976, and appear as entry number 14 on the docket sheet. Both are included in the district court record and are set forth in full at note 11 *infra.* Young's affidavit was executed July 8, 1976, while Todisco's affidavit was executed July 22, 1976.

   However, attached to appellee's brief as part of its appendix are two substantively different affidavits sworn by the same affiants: one by Young, at 1b–3b, executed January 7, 1977, and the other by Todisco, at 4b–6b, executed January 6, 1977. Suffice it to say that these appended affidavits are more favorable to appellee's cause than those submitted to the district court. Neither of the appended affidavits appears in the district court record, nor is there anything on the docket entries which reflects their existence. Although appellee refers ex-

tensively to the questioned affidavits in its brief, and, indeed, although there is little doubt that they have been submitted for our consideration, nowhere are we explicitly informed by appellee that the affidavits differ from those considered by the district court.

   It is hornbook law that this court generally cannot consider evidence which was not before the court below. *See Sound Ship Building Corp. v. Bethlehem Steel Co. (Inc.),* 533 F.2d 96, 101 n.3 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976), and cases cited therein; 10 C.A. Wright & A. R. Miller, Federal Practice and Procedure § 2716, at 435. Therefore, all further references in this opinion to the affidavits of Young and Todisco refer to the two documents filed with the district court and included in the certified record, as described above. Our discussion here applies with equal force to the affidavit submitted by appellant. *See* note 24 *infra.*

Agreement. The district court, applying Pennsylvania law, concluded that the Franchise Agreement did not demonstrate such a relationship and that UPC was entitled to summary judgment. However, section XXIII.I of the Franchise Agreement states: "This Agreement shall be interpreted, construed and governed under and by the laws of the state of Wisconsin." Thus, it could be argued that the district court, to the extent that it was required to interpret and construe the Agreement in determining the existence of a master-servant relationship, should have considered, under Pennsylvania choice-of-law theory, whether to give effect to section XXIII.I. Cf. Siata International U.S.A. Inc. v. Insurance Co. of North America, 498 F.2d 817, 820 (3d Cir. 1974); Boase v. Lee Rubber & Tire Corp., 437 F.2d 527, 529–30 (3d Cir. 1970). Nevertheless, we are now satisfied, and both parties agree without objection, that whether the relationship between UPC and its franchisee is ultimately determined by the law of Wisconsin, in deference to section XXIII.I, rather than by the law of Pennsylvania, is inconsequential since the laws of both states are in accord in their treatment of the matters before us. See, e.g., Raasch v. Dulany, 273 F.Supp. 1015, 1018 & n.1 (E.D.Wis.1967); Bond v. Harrel, 13 Wis.2d 369, 108 N.W.2d 552, 555 (1961). Having therefore concluded that no conflict of law exists, we find no reason to diverge from the position of both parties and the district court that Pennsylvania law governs in this case. Cf. Pierce v. Capital Cities Communications, Inc., 576 F.2d 495 (3d Cir. 1978).

A. *Appellant's Master-Servant Theory*

■ We first consider appellant's contention that summary judgment was erroneous because factual questions exist requiring jury resolution with respect to the precise nature of the relationship between UPC and its franchisee. Under Pennsylvania law, when an injury is done by an "independent contractor," the person employing him is generally not responsible to the person injured. Hader v. Coplay Cement Mfg. Co., 410 Pa. 139, 150–51, 189 A.2d 271, 277 (1963). However, when the relationship between the parties is that of "master-servant" or "employer-employee," as distinguished from "independent contractor-contractee," the master or employer is vicariously liable for the servant's or employee's negligent acts committed within the scope of his employment. Smalich v. Westfall, 440 Pa. 409, 415, 269 A.2d 476, 481 (1970). While Pennsylvania courts have set forth numerous criteria to determine whether a given person is an employee-servant or an independent contractor, see, e.g., Stepp v. Renn, 184 Pa.Super.Ct. 634, 637, 135 A.2d 794, 796 (1957), "the basic inquiry is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged . . . . The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result." Green v. Independent Oil Co., 414 Pa. 477, 483–84, 201 A.2d 207, 210 (1964) (citations omitted); see Johnson v. Angretti, 364 Pa. 602, 607, 73 A.2d 666, 669 (1950); Feller v. New Amsterdam Casualty Co., 363 Pa. 483, 486, 70 A.2d 299, 300 (1950); Joseph v. United Workers Ass'n., 343 Pa. 636, 639, 23 A.2d 470, 472 (1942). Actual control of the manner of work is not essential; rather, it is the right to control which is determinative. Coleman v. Board of Education, 477 Pa. 414, 383 A.2d 1275, 1279 (1978); Yorston v. Pennell, 397 Pa. 28, 39, 153 A.2d 255, 260 (1959).

■■ Difficulties arise, of course, in the application of these familiar principles to the facts of a given case. Each case must be decided on its own facts. George v. Nemeth, 426 Pa. 551, 554, 233 A.2d 231, 233 (1967); Namie v. DiGirolamo, 412 Pa. 589, 594, 195 A.2d 517, 519 (1963). The difficulties are perhaps especially evident where, as here, the alleged master and servant also

occupy the status of franchisor and franchisee. Some degree of control by the franchisor over the franchisee would appear to be inherent in the franchise relationship, see generally Brown, *Franchising—A Fiduciary Relationship*, 49 Texas L.Rev. 650 (1971), and may even be mandated by federal law.[5] However, as several courts have discerned, the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship. Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties. *See Singleton v. International Dairy Queen, Inc.*, 332 A.2d 160, 162 (Del. Super.Ct.1975); *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 219 S.E.2d 874, 877 (1975); Annots, 81 A.L.R.3d 764 (1977), 83 A.L.R.2d 1282 (1962) and authorities cited therein. The fact that the franchise agreement expressly denies the existence of an agency relationship is not in itself determinative of the matter. *See Levin v. Wear Ever Aluminum, Inc.*, 442 F.2d 1307, 1309 n.1 (3d Cir.1971); *George v. Nemeth, supra*, 426 Pa. at 554, 233 A.2d at 233; *Singleton v. International Dairy Queen, Inc., supra*, 332 A.2d at 163; *Murphy v. Holiday Inns, Inc., supra*, 219 S.E.2d at 876–77.[6]

In the present case there is no evidence that UPC exercised actual control over the manner in which Todisco operated the Reading store.[7] Instead, both parties rely upon various provisions of the Franchise Agreement as supporting their respective contentions regarding UPC's right to control Todisco's performance. While acknowledging that a franchise agreement may disguise what is essentially a master-servant relationship, appellee argues that the present Agreement at most creates only an independent contractor relationship. Under the terms of the Agreement, appellee observes, Todisco is merely the recipient of a license granted by UPC to operate a Union Prescription Center under that name and to use UPC's service mark and logo in conjunction therewith, in return for which Todisco pays to UPC a four and one-half percent monthly royalty out of the store's gross receipts (I.A, II.B). In fact, stresses appellee, the Agreement specifically provides that the franchisee pays all business expenses and taxes (XIII), bears the risk of litigation arising out of the store's operation (XX), has some say in choosing the inventory (VIII.A), and is required to identify himself as owner of the store on all signs and printed matter bearing the UPC mark (I.B).

Appellant contends, conversely, that the Franchise Agreement, considered as a whole, provides sufficient indicia of control to raise a factual question respecting the nature of the relationship between UPC and its franchisee. Appellant relies upon numerous contractual provisions which allegedly accord UPC the right to control

---

**5.** Under the provisions of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, the owner of a trade mark may license his mark to a "related company," "provided such mark is not used in such manner as to deceive the public." *Id.* § 1055. A "related company" is defined as "any person who . . . is *controlled* by" the trade mark owner, and the owner may lose his mark by "abandonment" if its use is discontinued or if the manner of its use "causes the mark to lose its significance as an indication of origin." *Id.* § 1127 (emphasis added). We note that neither party herein has discussed the applicability or relevance of the Lanham Act to the facts of the present case. ·

**6.** The Franchise Agreement in the case at bar states that UPC and its franchisee "are not and shall not be considered joint venturers, partners or the agents of each other" (XXIII.D).

**7.** When deposed by plaintiff, Todisco stated that during the one and one-half years that he had operated the store, several representatives of UPC had visited the establishment, but their functions were related to labor relations and future planning and unrelated to marketing. Appendix at 65–66. In any event, the absence of evidence relating to actual control would not necessarily preclude the finder of fact from inferring that UPC had the right to control the operation of the Reading store. *See Taylor v. Costa Lines, Inc.*, 441 F.Supp. 783, 785 (E.D.Pa. 1977).

specific details of the store's operation and which restrict Todisco's exercise of personal managerial discretion. Thus, under the terms of the Agreement: the franchisee "acknowledges that the public image and good name of the Union Prescription Centers requires the perpetuation of quality standards . . . and further requires the management and marketing advice of UPC in order to avoid improper or degrading techniques" (preamble); the franchisee may operate only under the UPC name and logo (I.A, B); UPC approves the location of the store and has the right to inspect the premises during normal business hours (IV.A); the franchisee must maintain the exterior and interior of the store premises in a "clean, orderly and attractive condition and shall maintain all structures, furnishings, fixtures, equipment and decorations in such a manner as to insure an attractive appearance of the Prescription Center" (IV.C); the franchisee must adhere to UPC's interior and exterior standard colors, lighting, design, equipment, and fixtures, and any new construction, facilities, or equipment must conform to such "national standards" (VI.A, B); the franchisee must maintain a "neat, orderly arrangement of displayed merchandise and a high degree of cleanliness" (VI.B); the store must be operated "as part of a national organization securing its strength through adherence to UPC's uniformly high standards of service, appearance, quality of equipment and proved methods of operation," and the franchisee agrees to "conform strictly" to "all such national standards" and to the provisions of the Franchise Agreement (VI.C); UPC has the "unqualified right" both to review the store's operations and consult with the franchisee on operating problems and to inspect the store "so as to assure maintenance of the high standards of the Union Prescription Center program, the goodwill of the public, and compliance with the provisions of this Agreement and with various licensing laws" (VI.E).

The Agreement further provides that the franchisee must exercise best efforts to secure union members for all construction and repair work and to have all invoices, state-ments, letterheads, prescription blanks, and other printed materials printed in union shops (VII); UPC designates the nature and minimum inventory requirements for the store subject to the franchisee's approval and, at franchisee's request, will make available pharmaceutical items bearing the UPC label (VIII.A); the franchisee may not supplement his inventory with items not directly related to the prescription, convalescent, or medical field without UPC's written consent (VIII.A); the franchisee must deliver and maintain inventory control data, delivery receipts, and records as prescribed by law and such other inventory records as required by UPC (VIII.A); UPC uniformly designates the equipment and fixtures for each store, to be paid for by the franchisee, and the franchisee authorizes UPC to order on his behalf equipment and fixtures necessary, in the sole judgment of UPC, to commence the store's operation (VIII.B); the franchisee must keep the store open for business a minimum of 46 hours per week (IX); the franchisee must use UPC's standard forms in operating the store, including prescription labels and files, rental contracts, letterheads, business cards, and accounting and inventory records (X.A); the franchisee must use UPC's uniform accounting system and make monthly financial reports to UPC (X.B); the franchisee must schedule specified inventory dates and mail a copy of the results to UPC on forms acceptable to the Internal Revenue Service (X.C).

The Franchise Agreement states that the franchisee must preserve complete records of all sales and purchases in a manner and form prescribed by UPC (X.F); UPC may examine and audit the franchisee's books and records at any reasonable time (X.G); the franchisee must purchase and maintain various types of insurance policies prescribed by UPC and must name UPC as an insured (XI.A), and if the franchisee fails to do so, UPC may purchase such insurance on his behalf and at his cost (XI.B); the franchisee must use and pay for all advertising and promotional materials developed by UPC, and must submit any other materials

to UPC for written approval prior to the distribution thereof (XII.B, E); the franchisee must utilize insignia, equipment, decals, personnel uniforms, truck signs and colors required by UPC (XII.C, D); the franchisee must conduct his business "in a manner that will reflect favorably at all times upon UPC . . . and the good name, goodwill and reputation thereof" (XII.H); UPC may terminate the license and Agreement if, *inter alia*, the franchisee breaches any provision of the Agreement (XV), in which case the franchisee must, at UPC's option, completely transfer to UPC a list of all employees, files, prescription lists, customers, and facilities, thereby effecting "a complete and effective transfer of the business" to UPC (XVI.B); the franchisee is subject to a restrictive covenant and UPC has a right of first refusal with regard to transfer of the business (XVII, XVIII); the franchisee indemnifies UPC against all liabilities of any kind arising out of the operation of the business (XX.).

In determining that no master-servant relationship existed between UPC and Todisco, the learned district judge reasoned that the provisions of the Franchise Agreement cited by plaintiff

> only give defendant-franchisor the tools with which to protect the proprietary interest in its name and goodwill. Nowhere in the agreement is there any provision giving defendant the right to control the manner in which Todisco was to perform the daily chores of the business. The restrictions in the agreement concerning the type of advertising, logos, and inventory do not give defendant the right to dictate the manner in which Todisco was to fill prescriptions; nor does the right retained by defendant-franchisor to inspect the premises and to terminate the agreement constitute such control over Todisco's manner of performance as to create vicarious liability. . . . Defendant was not concerned

with the 'means' by which Todisco conducted his pharmacy business; it was concerned only with the 'results' of his work.

428 F.Supp. at 666 (citations omitted).

■ While bearing in mind that we must not strain to discover issues of fact where none exist, *Lockhart v. Hoenstine,* 411 F.2d 455, 459 (3d Cir.), *cert. denied,* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969), we nevertheless conclude that the Agreement, considered as a whole, is not free of ambiguity or the possibility of inferences contrary to the district judge's construction and interpretation of that document. When read in its entirety and in a light most favorable to appellant, the Agreement appears so broadly drawn as to render uncertain the precise nature and scope of UPC's rights vis-a-vis its franchisee. Thus, in the absence of further evidence of what the subscribing parties to the Franchise Agreement meant and understood by its terms, it cannot be determined as a matter of law on the present record that UPC did not have the right to control the manner of Todisco's performance or that UPC was not the "master" of Todisco.

■ Many of the provisions cited by appellant indicate that UPC reserved the right to control numerous specific facets of the franchisee's business operation, ranging from the appearance and contents of the store, its advertising and promotional programs, and its accounting, inventory, and record-keeping systems, to the minimum number of weekly operating hours, the type of prescription labels and files, personnel uniforms, and the color of delivery trucks. However, even assuming, as the district judge observed, that these more specific manifestations of control only evidence UPC's concern with the "result" of the store's operation rather than the "means" by which it was operated,[8] other provisions

---

8. Compare, however, the following language from *Singleton v. International Dairy Queen, Inc., supra,* 332 A.2d at 162–63: "When an entity can control the size, shape, and appearance of its [franchisee's] establishment, impose the nationally known sign 'Dairy Queen' as the only sign for the premises, require all containers to show the name of the parent company, dictate portion control, the size and shape of containers, the uniforms of the employees, sub-

of the Agreement are so nebulously and generally phrased as to suggest that UPC retained a broad discretionary power to impose upon the franchisee virtually any control, restriction, or regulation it deemed appropriate or warranted. When a franchisee is required, *inter alia,* to perpetuate "quality standards," to submit to UPC's management and marketing advice "to avoid improper or degrading techniques," to maintain the premises and equipment in an "attractive condition," to ensure "a high degree of cleanliness" and a "neat, orderly arrangement" of merchandise, to conform all equipment and facilities to UPC's "national standards," to adhere strictly to UPC's "uniformly high standards of service, appearance, quality of equipment and proved methods of operation," and to conduct his business "in a manner that will reflect favorably at all times upon UPC," and when the franchisor has the "unqualified right" to review the store's operations and to inspect the store "to assure maintenance of [UPC's] high standards . . . ," the goodwill of the public, and compliance with the provisions of this Agreement and with various licensing laws," as well as the right to terminate the relationship for breach of any provision of the Agreement, including those here cited,[9] we believe that reasonable minds could differ as to whether or not UPC had the right to control Todisco's physical conduct and the manner in which he operated the store, including the prescription-filling activity. As one commentator has noted:

> Through a franchise agreement containing broadly worded clauses a franchisor can very effectively control the day to day operation of the franchise. For example,

ject the franchisor to the obligation to obey subsequent *rules and regulations,* reserve the right to *inspect* the premises . . . , name the suppliers and even dictate what else may be sold on the premises, there appears little else to establish agency. The very lifeblood of the agent is in the hands of the franchisor."

**9.** Under Pennsylvania law, both the right to inspect the work of another and to terminate the employment of another are important factors in determining the existence of a master-servant relationship, though not controlling in and of themselves. *See George v. Nemeth,*

> 'The franchisee is required to conduct his business in strict accordance with the parent company's policies and regulations and as these policies or regulations may be promulgated from time to time by the parent company.'

A clause, such as this can hardly be considered anything but a means of dictating the most minute details of how the outlet should be run.

Comment, *A Franchisor's Liability for the Torts of His Franchisee,* 5 U.San Fran.L. Rev. 118, 127 (1970) (footnote omitted). Compare, for example, section VI.C of the present Agreement, which requires the franchisee to "conform strictly" to "UPC's uniformly high [national] standards of service, appearance, quality of equipment and proved methods of operation." Thus, although the district judge determined that "[n]owhere in the agreement is there any provision giving defendant the right to control the manner in which Todisco was to perform the daily chores of the business" (emphasis added), we believe that that issue cannot be resolved conclusively on the present record without drawing inferences favorable to the moving party, which is forbidden in ruling on a motion for summary judgment. *See Thompson-Starrett International, Inc. v. Tropic Plumbing, Inc.,* 457 F.2d 1349, 1352 (3d Cir. 1972).

▮ Although the affidavits of Todisco and Young, submitted by UPC,[10] are consistent with its assertion that it did not retain control over its franchisee's manner of operation, they are, as the district judge acknowledged, "essentially conclusory"[11]

*supra,* 426 Pa. at 556, 233 A.2d at 233; *Cox v. Caeti,* 444 Pa. 143, 148, 279 A.2d 756, 758 (1971).

**10.** *See* note 4 *supra* concerning these affidavits.

**11.** The two affidavits are identical in substance and read in pertinent part as follows:

> 1. Defendant, Union Prescription Centers, Inc., was not at any time material to plaintiff's claim, the owner, operator, possessor, or in control of the drug store known as Union Prescription Center. . . . Fur-

and lacking in specific facts, and of little assistance in reflecting the meaning of the control provisions of the Agreement. *See Olympic Junior, Inc. v. David Crystal, Inc.,* 463 F.2d 1141, 1146 (3d Cir. 1972); *McShane Contracting Co., Inc. v. United States Fidelity & Guaranty Co.,* 61 F.R.D. 478, 481 (W.D.Pa.1973). It is true, as appellee stresses, that appellant relied solely upon the Franchise Agreement and failed to submit counteraffidavits or other evidence [12] in support of her assertions of agency during the district court proceedings. However, the movant for summary judgment has the burden of demonstrating the absence of genuine issues of material fact, *Lockhart v. Hoenstine,* 411 F.2d 455, 458 (3d Cir.), *cert. denied,* 396 U.S. 941, 90 S.Ct. 378, 24 L.Ed.2d 244 (1969), and even if the opposing party fails to file contravening affidavits or other evidence, summary judgment must still be "appropriate" and will be denied where the movant's own papers demonstrate the existence of material factual issues. Rule 56(e), Fed.R.Civ.P., 28 U.S.C.; *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 159–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Mutual Fund Investors, Inc. v. Putnam Management Co., Inc.,* 553 F.2d 620, 625 (9th Cir. 1977); *Andersen v. Schulman,* 337 F.Supp. 177, 181–82 (N.D.Ill.1971).

We therefore conclude that on the present record genuine issues of material fact exist regarding the nature of the relationship between appellee and its franchisee which preclude the entry of summary judgment.

## B. *Appellant's Holding Out or Apparent Agency Theory*

As an alternative theory upon which to impose liability on UPC, appellant argues that UPC "held itself out" as the operator of the Reading store or as the employer of Todisco and thus should be vicariously liable for the alleged negligent acts of its franchisee. In essence, appellant contends that UPC led the public, including the decedent, to believe that it was dealing not with a local independent pharmacist, but rather with UPC, a nationally established and uniformly controlled establishment, or with a servant or employee thereof, and that such representations of agency were made to induce, and in fact did induce, reliance and confidence in consumers in the skill and reputation of the franchise entity, all in furtherance of UPC's own economic goals. In granting summary judgment in favor of UPC, the district court held that the " 'holding out' theory has not been generally applied," and that in any event plaintiff had proffered insufficient evidence to raise a factual issue as to whether UPC held out Todisco as its agent or employee.

Appellant relies, *inter alia,* upon § 267 of the *Restatement (Second) of Agency* (1958), which provides as follows:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is

---

ther, at no time relevant hereto did Union Prescription Centers, Inc. have any interest whatsoever in the aforesaid retail drug store.

2. Defendant . . . has never supplied or sold any medication to the drug store. . . .

3. Defendant . . . and . . . Todisco entered into a franchise agreement . . whereby Todisco purchased from defendant the right to acquire and operate a Union Prescription Center. . . .

4. Joseph J. Todisco, Jr., acting as an independent contractor in acquiring ownership of the franchise from defendant . . . is not nor ever has been an agent, servant, workman and/or employee of defendant.
. . .

5. The defendant . . . never controlled nor had the right to control the physi-

cal conduct of . . . Todisco . . . in performing his services to the public as a licensed pharmacist.

6. None of the acts which the plaintiff alleges were done by defendant . . . were ever done by defendant, its agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of the defendant.

7. At no time material to plaintiff's cause of action was there even the remotest contact between Union Prescription Centers, Inc., any of its agents, servants, workmen and/or employees and plaintiff and/or her decedent.

12. As the district judge observed, the deposition of Todisco, taken and submitted by plaintiff, does little to buttress plaintiff's allegation of control.

subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Insofar as we are aware, no Pennsylvania court has discussed the applicability of § 267 to that state's agency law or otherwise squarely considered the liability of an ostensible principal for the negligence of an ostensible agent. It is thus our function in this diversity action to "predict" whether the Pennsylvania courts would apply a "holding out" or "apparent agency" theory, such as that formulated in § 267, on the facts presented in this case. *Samuelson v. Susen*, 576 F.2d 546 (3d Cir. 1978); *Keystone Aeronautics Corp. v. R. J. Enstrom Corp.*, 499 F.2d 146, 147 (3d Cir. 1974); *In re Royal Electrotype Corp.*, 485 F.2d 394, 396 (3d Cir. 1973).

Considerable guidance in this matter is provided by the recent decision of Chief Judge Lord in *Taylor v. Costa Lines, Inc.*, 441 F.Supp. 783 (E.D.Pa.1977). *Taylor* involved a negligence action brought by a cruise passenger against the vessel owner (Costa) and a ground tour operator (Alstons) for personal injuries sustained in an auto accident while she was on the ground tour. Alleging that Costa had represented that Alstons was its servant or agent, plaintiff contended that Costa was vicariously liable for Alstons' alleged negligence under the doctrines of "apparent authority" or "authority by estoppel." In denying Costa's motion for summary judgment, Chief

Judge Lord predicted that the Supreme Court of Pennsylvania would adopt § 267 of the *Restatement (Second) of Agency*, stating as follows:

> The applicability of this section to Pennsylvania agency law appears to be a matter of first impression, but we conclude that Pennsylvania would follow section 267 for two reasons: the Pennsylvania Supreme Court's customary adherence to the *Restatement* and the unanimous adoption of section 267 by those courts, including the Third Circuit, which have addressed this issue. *Gizzi v. Texaco, Inc.*, 437 F.2d 308 (3d Cir. 1971).
>
> Costa could be liable under this theory if the plaintiff demonstrated that: (1) Costa represented that Alstons was its servant; (2) plaintiff relied on Alstons' skill as a result of that representation; and (3) such reliance was justifiable.

441 F.Supp. at 786 (footnote omitted).

■■■ We agree, essentially for the reasons enunciated in *Taylor*, that the Supreme Court of Pennsylvania would adopt § 267 or some similar principle of "apparent agency." In an analogous context, Pennsylvania courts have long utilized the closely related doctrines of "apparent authority" and "agency by estoppel" in cases dealing with contractual liability and have approved the *Restatement* formulations of those theories.[13] While appellee asserts that such concepts are wholly inapposite to causes arising in tort,[14] no argument has

---

**13.** Thus, "apparent authority" is the "power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if, for instance, the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power." *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 375, 246 A.2d 407, 410 (1968), *citing, inter alia, Restatement (Second) of Agency* §§ 8, 27; *see Apex Financial Corp. v. Decker*, 245 Pa.Super. 439, 369 A.2d 483 (1976).

With respect to "agency by estoppel," the Pennsylvania Supreme Court has stated: "Agency by estoppel is defined in section 8B. of the Restatement (Second) of Agency and the

doctrine has been embraced by this Court in *Reifsnyder v. Dougherty*, 301 Pa. 328, 152 A. 98 (1930). *Reifsnyder* emphasized two basic elements of agency by estoppel: (1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and (2) there must be justifiable reliance by the third party. . . . Agency by estoppel is generally deemed to be closely related to apparent authority. . . . Thus, alternatively stated, a principal who clothes his agent with apparent authority is estopped to deny such authority." *Turnway Corp. v. Soffer*, 461 Pa. 447, 457, 336 A.2d 871, 876 (1975) (citations and footnote omitted).

**14.** Although appellee cites *Janeczko v. Manheimer*, 77 F.2d 205 (7th Cir. 1935), as authority for the proposition that Pennsylvania courts have traditionally rejected the application of

been made that the policies or factual issues underlying apparent authority or agency by estoppel differ substantially from those upon which § 267 is predicated.[15]

Indeed, the decision of the Pennsylvania Supreme Court in *Fidelman-Danziger Inc. v. Statler Mgt., Inc.,* 390 Pa. 420, 136 A.2d 119 (1957),[16] buttresses our conclusion that Pennsylvania courts would approve the theory of apparent agency set forth in § 267. In that case plaintiff sued the operator of a hotel checkroom, along with the hotel and its management company, to recover the value of jewelry which had been checked in but not returned by the hotel checkroom. After determining that the relationship between plaintiff and the checkroom operator was a bailment and that liability was to be determined by relevant negligence principles, the court concluded that liability could be extended to the other defendants as well. Although the court relied analogously upon the rule that a possessor of land who in the course of business holds it open to members of the public is liable for bodily harm caused on part of the land leased to concessionaires, it stated:

> Here the Pittsburgh Hotels, Inc., and its manager, Statler Management, Inc., permitted their concessionaire, Stanley Parkinson, to conduct business activities on the hotel premises in the name of the hotel. *The conduct of the check room in that manner must certainly estop the 'Pittsburgh Hotels, Inc.' as well as the Statler Company, its agent in charge, from now denying that apparent agency; and particularly in the present case since supervision over the concessionaire is reserved to the corporate defendants. To*

*people using the check room, everything indicated they were dealing with the William Penn Hotel.*

136 A.2d at 124 (emphasis added).

Of relevance, too, is this court's decision in *Brown v. Moore,* 247 F.2d 711 (3d Cir. 1957), *cert. denied,* 355 U.S. 882, 78 S.Ct. 148, 2 L.Ed.2d 112 (1957), a wrongful death and survival action in which plaintiff sought to hold the operators of a private sanitarium vicariously liable for the negligent malpractice of a physician at the sanitarium. Although the physician was found to be a servant or employee of the sanitarium, this court predicted that even if the physician were an independent contractor vis-a-vis the sanitarium, "where there has been a *holding out,* a *representation* to a patient or to his family as members of the public, that medical treatment is to be administered in a private hospital or sanitarium by a doctor employed therein, the Courts of the Commonwealth of Pennsylvania would apply the doctrine of *respondeat superior* and hold the owners or operators of the sanitarium liable for the malpractice of the doctor. In other words Doctor Kelly could be regarded as having the status of an independent contractor in his relation to the partners in the Sanitarium but in his relation to Brown would be deemed to be an employee of the Sanitarium." *Id.* at 719–20 (emphasis in original); *accord, St. Paul Fire & Marine Insurance Co. v. Aetna Casualty & Surety Co.,* 394 F.Supp. 1274, 1275–76, *aff'd mem.,* 532 F.2d 747 (3d Cir. 1976).

In addition to the above, we think that the Supreme Court of Pennsylvania's customary practice, when fashioning new principles of law, of according great weight to

---

apparent agency or authority and agency by estoppel to all tort actions, we do not deem a pronouncement of the Seventh Circuit binding on a matter of Pennsylvania law; nor do we find the cases cited therein apposite to the case at bar. While *Trautwein v. Loeb,* 19 Pa.D. & C. 394 (Phila.Co.1933), might better fuel appellee's argument, that case involved a suit for libel where it was clear that plaintiff could not establish the element of reliance. *Id.* at 395.

**15.** *See Taylor v. Costa Lines, Inc., supra,* 441 F.Supp. at 786 & n.1. In *Mabe v. B.P. Oil Corp.,* 31 Md.App. 221, 356 A.2d 304 (1976),

*rev'd on other grounds,* 279 Md. 632, 370 A.2d 554 (1977), the court noted: "Although there is no Maryland case law dealing with the liability for tortious acts of apparent servants, the definition adopted by the Court of Appeals to describe apparent authority or authority by estoppel in cases based on contractual liability is sufficiently comprehensive to include tort liability as well." 356 A.2d at 307.

**16.** The court, per curiam, adopted the opinion of the trial court, reported at 9 Pa.D. & C.2d 677; the trial court opinion is reprinted in full at the given Atlantic Reporter citation.

the decisions of other jurisdictions and the trend of recent cases [17] would lead it to follow the numerous courts, including the decision of this court in *Gizzi v. Texaco, Inc.*, 437 F.2d 308 (3d Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 57 (1971),[18] which have approved, at least in principle, § 267 or similar doctrines of apparent agency and authority in situations analogous to the present case. *See e.g., Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (5th Cir. 1975); [19] *Amritt v. Paragon Homes, Inc.*, 474 F.2d 1251 (3d Cir. 1973); *Standard Oil Co. v. Gentry*, 241 Ala. 62, 1 So.2d 29 (1941); *Kuchta v. Allied Builders Corp.*, 21 Cal. App.3d 541, 98 Cal.Rptr. 588 (1971); *Singleton v. International Dairy Queen, Inc.*, 332 A.2d 160 (Del.Super.Ct.1975); [20] *Sapp v.*

17. *See, e.g., Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973); *Falco v. Pados*, 444 Pa. 372, 282 A.2d 351 (1971); *Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84 (1970); *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964).

18. Plaintiff in *Gizzi* sustained personal injuries when a van which he was driving crashed because of defective brakes. The van had been purchased from a Texaco station operator who had installed and tested the brake system. Plaintiff contended that Texaco, Inc. was liable on the ground that it had clothed the station operator with apparent authority to make the repairs and sell the vehicle on its behalf and plaintiff had relied upon such representations and had reasonably assumed that Texaco, Inc. would be responsible for any defects. Reversing a directed verdict in favor of Texaco, Inc., this court, applying New Jersey law, held that the question of apparent authority was for the jury, stating as follows: "The concepts of apparent authority, and agency by estoppel are closely related. Both depend on manifestations by the alleged principal to a third person, and reasonable belief by the third person that the alleged agent is authorized to bind the principal. The manifestations of the principal may be made directly to the third person, or may be made to the community, by signs or advertising. Restatement (Second), Agency §§ 8, 8B, 27 (1957). In order for the third person to recover against the principal, he must have relied on the indicia of authority originated by the principal, *Bowman v. Home Life Ins. Co. of America*, 260 F.2d 521 (3 Cir. 1958); Restatement (Second), Agency § 267 and such reliance must have been reasonable under the circumstances." 437 F.2d at 309.

19. In *Wood*, the holder of an oil company credit card which, at the direction of a credit information company, was taken and retained by a clerk at the franchised Holiday Inn at which plaintiff was a guest, brought an action for damages against the oil company, the franchisor (Holiday Inns, Inc.), the franchisee (Interstate), and the motel clerk (Goynes). After a jury verdict for plaintiff, the district court granted the franchisor's motion for judgment notwithstanding the verdict. Observing that an "agency relationship may arise from acts and appearances which lead others to believe that such a relationship has been created," the Fifth Circuit concluded that a jury question was presented as to whether the motel clerk was an apparent servant or agent of the franchisor, Holiday Inns, Inc. The court reasoned as follows: "The license agreement between Holiday Inns, Inc., and Interstate provided that the Phenix City facility should be constructed and operated so that it would be 'readily recognizable by the public as part of the national system of "Holiday Inns." ' Indeed, the Phenix City facility was required to use the same service marks and trademarks, the exterior and interior decor as the Holiday Inns owned by the parent company. A jury could therefore, reasonably conclude that the license agreement required the Phenix City facility to be of such an appearance that travelers would believe it was owned by Holiday Inns, Inc. . . . [T]here is virtually no way Wood could have known that the servants in the Phenix City facility were servants of Interstate, not of Holiday Inns, Inc. Indeed, the manifestations that Holiday Inns, Inc., required Interstate to make could only have served to convince Wood that Jessie Goynes was a servant of the parent company." 508 F.2d at 176.

20. In *Singleton*, the father of a child who was injured when she fell through a door of a franchised ice cream store brought suit against both the franchisee and the franchisor. Denying the franchisor's motion for summary judgment, the court held that a factual question existed as to whether the franchisee was an apparent servant or agent of the franchisor. The court stated: "The concept of 'apparent' authority or whether one is the 'apparent servant or agent' of another depends on manifestations by one party which lead third parties to believe another is his agent. . . . Additionally, one who represents through 'apparent authority' that another is his servant and causes a third person to justifiably and reasonably rely upon the care and skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant as if he were such. Re. of Agency 2d Sect. 267. This concept was recognized in *Gizzi v. Texaco, Inc.* . . . ." 332 A.2d at 163 (citation omitted).

*City of Tallahassee,* 348 So.2d 363 (Fla.Dist. Ct.App.1977), *cert. denied,* 354 So.2d 985 (Fla.1977); *Buchanan v. Canada Dry Corp.,* 138 Ga.App. 588, 226 S.E.2d 613 (1976); *Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977); *Mabe v. B.P. Oil Corp.,* 31 Md.App. 221, 356 A.2d 304 (1976), *rev'd on other grounds,* 279 Md. 632, 370 A.2d 554 (1977); *Thomas v. Checker Cab Co., Inc.,* 66 Mich.App. 152, 238 N.W.2d 558 (1975); *Montgomery Ward & Co. v. Stevens,* 60 Nev. 358, 109 P.2d 895 (1941); *Chevron Oil Co. v. Sutton,* 85 N.M. 679, 515 P.2d 1283 (1973). *See generally,* Annot., 81 A.L.R.3d 764 (1977); Comment, *Liability of a Franchisor for Acts of the Franchisee,* 41 So.Cal. L.Rev. 143 (1968); Comment, *A Franchisor's Liability for the Torts of His Franchisee,* 5 U.San Fran.L.Rev. 118 (1970). *But see Slack v. Treadway Inn of Lake Harmony, Inc.,* 388 F.Supp. 15 (M.D.Pa. 1974).[21]

▪ Having determined that Pennsylvania courts would sanction the "apparent agency" theory advanced by appellant,[22] we next consider appellant's contention that whether or not UPC held itself out as the owner or operator of the Reading store was a question of fact for the jury to resolve and that the district court thus erred in holding as a matter of law that the evidence produced by plaintiff was "too slender a reed upon which to base a material issue for trial on the purported issue that the defendant held Todisco out as its employee." After a careful examination of the record in this case, we conclude that factual questions exist as to whether appellee had held out or represented its franchisee to be its servant or employee.

Contending that no affirmative holding out ever occurred, and, indeed, that it took substantial steps to ensure that the public was accurately apprised of Todisco's status, appellee relies upon the following provision of the Franchise Agreement: "The Owner [franchisee] shall show his name (corporate, partnership or individual) in connection with the use of such licensed mark following 'Union Prescription Center' in conjunction with the word 'license' or otherwise identify himself as the owner of the Union Prescription Center under a license from UPC, on all invoices, statements, letterheads, prescription blanks and other printed matter, as well as on all signs posted on the Union Prescription Center premises. Applications for local licenses or other entries in public records will be made in the Owner's name" (I.B). In addition, stresses appellee, Todisco, when deposed, stated that a nameplate reading "Joseph J. Todisco, Jr., Registered Pharmacist" was displayed on the counter in front of him in the store; that he had registered in the fictitious names index for Berks County under the fictitious name "Union Prescription Center"; and that he had registered with the state Board of Pharmacy under the name "Union Prescription Center" as well as under his own name.

---

**21.** In *Murphy v. Holiday Inns, Inc.,* 216 Va. 490, 219 S.E.2d 874 (1975), plaintiff filed suit against the franchisor for personal injuries resulting from a fall on the premises of the franchised motel at which she was a guest. On appeal from summary judgment in favor of the franchisor, plaintiff alleged that " '[b]y holding out the operation of the motel as a "Holiday Inn" motel [defendant] . . . has created the appearance that a master/servant relationship exists, and where a third party so relies, the principal should be estopped to deny the existence of this relationship.' " The court, however, found that plaintiff's "holding out" theory had not been considered by the trial court in the first instance and therefore declined to decide it on appeal. 219 S.E.2d at 875.

**22.** We note, in light of our determination that Pennsylvania courts would apply § 267 or some similar theory, that § 267 was apparently not relied upon specifically by plaintiff in the district court proceedings. Nevertheless, because the general theory of apparent agency was clearly before the district court, we need not remand the case for a preliminary determination by the district court as to the applicability of § 267. *Compare Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F.2d 33 (10th Cir. 1975), in which the court of appeals remanded the case to the district court because the state supreme court adopted strict liability in tort after the district court entered summary judgment for the defendant but also because it did not appear that strict liability theory had ever been argued to the district court, though it had been argued to the court of appeals. *Id.* at 40–41.

Appellant, however, relies upon evidence tending to demonstrate that in fact customers of the Reading store were led to believe that they were dealing with the corporate defendant, UPC, and that they were given no notice that the store was an entity independently owned and operated by Todisco. When deposed by plaintiff, Todisco stated that there was no place in the store where customers could note that he was a "franchisee." The bags, prescription labels, and cash register receipts used by the Reading store (appended as exhibits to the deposition transcript) all bear the name "Union Prescription Centers" or "Union Prescription Center," the bags also bearing a logo, and fail to identify Todisco as the owner or operator of the store. Similarly, Todisco testified that the store's local advertising, through media such as ball point pens, local newspapers, and nail files, all say "Union Prescription Center" and omit any mention of Todisco's name. Todisco further stated that the store is listed in the Reading phone directory as "Union Prescription Center" and that the telephone is answered "Union Prescription Center."

According to appellant, such indicia of apparent agency are directly attributable to UPC, the ostensible principal, because UPC, through the regulatory provisions of the Franchise Agreement, controlled the manner in which the Reading store was perceived by the public. Appellant points to the following provisions of the Agreement: The franchisee [owner] may promote and advertise only with the logo, service mark, or insignia prepared and submitted by UPC to the owner (I.A); UPC has established interior and exterior standard colors, lighting, design, equipment and fixtures designed to provide national identification (VI.A); "Owner acknowledges UPC's rights to and interest in its present and future distinguishing characteristics, and UPC's exclusive rights to such characteristics. These characteristics include the service mark "Union Prescription Center" and the Union Prescription Center logo, used in any form and in any design, alone or in combination and all present and future names, service marks, trademarks, trade names, insignia, slogans, emblems, symbols, designs or other characteristics used in connection with the Union Prescription Centers. *Owner hereby acknowledges that these distinguishing characteristics have acquired a secondary meaning which indicates that the Union Prescription Center is operated by or with the approval of UPC"* (VI.D) (emphasis added); UPC has developed an effective launch program for introducing the Union Prescription Centers for which the owner must pay (XII.A); Owner is required to utilize insignia, equipment, decals, personnel uniforms, truck signs and colors, indoor signs and posters, and such other advertising and promotional materials as may be required by UPC to maintain uniformity of appearance, national recognition, point of purchase impact and full penetration of promotional opportunities (XII.C); Owner must submit to UPC for written approval prior to dissemination any advertising or promotional material that has not been developed by UPC (XII.E); Owner is required to use the standard Union Prescription Center sign or signs as specified by UPC (XII.D); UPC specifies that owner shall use standard forms in the operation of the Prescription Center, including prescription labels, letterheads, and business cards (X.A).

Although the district judge concluded that in light of the evidence submitted by UPC, "the absence of Todisco's name on the prescription labels, bags and advertising is too slender a reed upon which to base a material issue for trial on the purported issue that the defendant held Todisco out as its employee," we believe that reasonable persons could differ as to whether UPC clothed its franchisee with indicia of agency or authority. Indeed, the evidence, considered as a whole and in a light most favorable to appellant, may be viewed as giving rise to conflicting inferences of fact which resist the summary judgment process.

Appellee's assertion that no representations of agency or authority were ever made is contradicted by appellant's evidence suggesting that in fact UPC, by strictly controlling the manner in which the

franchisee was perceived by the public, created an appearance of ownership and control purposefully designed to attract the patronage of the public. *See Wood v. Holiday Inns, Inc.*, discussed at note 19 *supra.* While appellee, emphasizing that the Franchise Agreement required the franchisee to identify himself as owner of the store in conjunction with his use of UPC's mark and logo, asserts that it cannot be held accountable for Todisco's failure in this regard and that it had no notice of it, a review of all the evidence reveals that several representatives of UPC actually visited Todisco's store on numerous occasions (see note 7 *supra*) and that UPC had an unqualified right to inspect the Reading store (Franchise Agreement, VI.E). Thus, a potential question is presented as to whether UPC had actual or constructive knowledge of Todisco's failure to appraise the public of his status and acquiesced therein. *See Gizzi v. Texaco, Inc., supra*, 437 F.2d at 310; *Mabe v. B.P. Oil Corp., supra*, 356 A.2d at 309–10 & n. 3, *rev'd on other grounds*, 370 A.2d 613. The issue, we note, is not what agreements were entered into between UPC and Todisco to establish a relationship other than agency, but rather what representations were actually made to the customers of the Reading store. *Amritt v. Paragon Homes, Inc., supra*, 474 F.2d at 1252. Moreover, the sign identifying Todisco as "Registered Pharmacist" could reasonably be viewed as merely a statement of professional qualification rather than, as appellee insists, a clear indication Todisco independently owned and operated the store. So, too, while it is urged that Todisco manifested ownership in registering with both the county and the state pharmacy board, there is no evidence that decedent was or should have been aware of such facts. These are all factors to be weighed and considered by the finder of fact in determining whether the elements of apparent agency have been established.[23]

**23.** Appellee cites numerous cases, mostly involving oil company-dealer franchise relationships, which appear to hold that as a matter of law the mere use of signs and advertising bearing the oil company's name or trademark does not create an ostensible agency issue for the jury. *See, e.g., Apple v. Standard Oil Division of American Oil Co.*, 307 F.Supp. 107 (N.D.Cal. 1969); *Coe v. Esau*, 377 P.2d 815 (Okl.1963); *Cawthon v. Phillips Petroleum Co.*, 124 So.2d 517 (Fla.App.1960); *Sherman v. Texas Co.*, 340 Mass. 606, 165 N.E.2d 916 (1960). The fountainhead of this rule would appear to be *Reynolds v. Skelly Oil Co.*, 227 Iowa 163, 287 N.W. 823 (1939), which held that "[i]t is a matter of common knowledge that these trademark signs [of oil companies] are displayed throughout the country by *independent* dealers [of oil company products]." 287 N.W. at 827 (emphasis added). Other authorities, however, suggest that application of the common knowledge rule has been confined largely to the context of oil company franchise relationships and certain other specific business operations. *See, e.g., Beck v. Arthur Murray, Inc.*, 245 Cal.App.2d 976, 54 Cal.Rptr. 328 (1966), where the court stated: Defendant properly argues that the mere licensing of trade names does not create agency relationships either ostensible or actual. Defendant's cases in support of this proposition hold that no agency existed, often on the grounds that in *those particular* businesses, it was 'common knowledge' that those businesses were run by independent dealers. . . . [J]ust because it is 'common knowledge' that certain businesses are independently owned, this is not a matter of 'common knowledge' for all businesses. On the contrary, it is equally 'common knowledge' that certain nationwide businesses are not independently owned but are owned by a single organization which operates by chains or branches." 245 Cal.App.2d at 981, 54 Cal.Rptr. at 331–32. Indeed, in *Gizzi v. Texaco, Inc., supra*, itself an oil company franchise case, this court stated that the "manifestations of the principal may be made directly to the third person, or may be made to the community, by signs or advertising." 437 F.2d at 309 (citations omitted). In sum, we do not think that the common knowledge rule, whatever its viability in the cases cited by appellee, has application in the case at bar. As one commentator has observed: "The reality of the situation is that the trade name in franchising is indispensible. Very often it is the name alone which sells the product. For example, a hungry motorist, needing a quick meal in an unfamiliar town, is likely to go into any drive-in that he sees, if the only identifying signs were Bill's Hamburgers of Joe's Tacos. However, this is clearly not the case if, instead the signs read McDonald's or Dairy Queen. The motorist is much more likely to choose the drive-in whose name he recognizes and associates with a particular kind of service and food. The franchisor, by displaying the brand name, is saying to the public that at this particular drive-in you will receive the same kind of food and beverages that you receive at any other drive-in at which this sign is displayed. In

We stress that our decision here expresses no view whatsoever as to the ultimate outcome or disposition of this case. In order to recover on a theory of apparent agency, plaintiff must establish not only the element of representations but also that of justifiable reliance on those representations. *Gizzi v. Texaco, Inc., supra; Taylor v. Costa Lines, Inc., supra.* An examination of the district court record reveals that neither party submitted evidence bearing directly on the critical question of reliance. Nor is it apparent that the district judge considered that element in granting summary judgment. However, because it was the burden of defendant, the movant for summary judgment, to establish the absence of genuine issues of material fact, we cannot deem plaintiff's failure to submit evidence of reliance as fatal to her cause at this stage of the proceedings.[24] *Cf. Gray v. Greyhound Lines, East,* 178 U.S.App.D.C. 91, 96–7, 545 F.2d 169, 174–75 (1976); *Heirs of Fruge v. Blood Services,* 506 F.2d 841, 844 (5th Cir. 1975); *Thomas v. Petro-Wash, Inc.,* 429 F.Supp. 808, 816 (M.D.N.C.1977).

The judgment will be reversed and the cause remanded for proceedings consistent with this opinion.

## APPENDIX
## UNION PRESCRIPTION CENTERS, INC. FRANCHISE AGREEMENT

THIS AGREEMENT, made and entered into this 15th day of October, 1974, by and between UNION PRESCRIPTION CENTERS, INC., a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business being located at 105 West Michigan Street, Milwaukee, Wisconsin, hereinafter referred to as "UPC", and Joseph J. Todisco, Jr., who desires the right to acquire and operate a Union Prescription Center, hereinafter referred to as "Owner".

## *WITNESSETH:*

WHEREAS, UPC is the originator and creator of a system for the operation of ethical prescription pharmacies hereinafter referred to as "Union Prescription Centers", and

WHEREAS, UPC has expended time, effort and money to acquire experience and knowledge with respect to franchising and to the business of operating Union Prescription Centers together with the activities related thereto, and

WHEREAS, UPC has developed a format for the operation of the Union Prescription Centers with related activities pertaining thereto under the Union Prescription Center trade name, and

WHEREAS, UPC does provide management and marketing advice throughout the franchisee's tenure, and

WHEREAS, UPC is the owner of certain proprietary and other property rights and interest in and to the trade name and service mark "UNION PRESCRIPTION CENTERS", and

WHEREAS, the Owner wishes to engage in the described business as a franchised operator of a Union Prescription Center, and

WHEREAS, UPC itself, and in conjunction with its other Union Prescription Center franchisees, has established a reputation

---

short, the franchisor is 'holding out' all the franchises as the same. If the signs are accepted as 'holding out' all the retail dealers as the same, reasonable reliance is not far behind. The mass media advertising employed by the franchisors can only help to reinforce the public's reliance on the brand name. It is not hard to believe that there are many people . . . who believe that all service stations or drive-ins or clothes cleaners displaying the same name are run by the same company." Comment, *"A Franchisor's Liability for the Torts of His Franchisee,"* 5 U.San Fran.L.Rev. 118, 130 (1970).

24. We must add that appended to appellant's brief is an affidavit signed by Mrs. Drexel, the substance of which is an allegation of reliance. The affidavit was executed June 13, 1977, several months *after* the March 1977 order of the district court granting summary judgment. We have earlier in this opinion, discussed the impropriety of supplementing the record with materials not before the district court, and what we have said there (see note 4 *supra*) in reference to appellee's affidavits applies with equal force to appellant's affidavit.

with the public for a specialized type of business operation and, as an entity, has established certain business techniques which, when properly employed and managed, inure to the benefit of UPC and its franchisees, and

WHEREAS, the Owner recognizes the importance to UPC and all franchisees, of maintaining the relationship herein created, each with the other, and the equal importance of maintaining the distinctive features of the business to the public, in order that the reputation and public image of the Union Prescription Centers be maintained, and

WHEREAS, the Owner recognizes and acknowledges the unique relationship of each franchisee to the other, to prospective franchisees and to UPC, under the Union Prescription Center trade name and service mark, and further recognizes and acknowledges that the public image and good name of the Union Prescription Centers requires the perpetuation of quality standards, in order for all parties to be protected and benefit from the relationship, and further requires the management and marketing advice of UPC in order to avoid improper or degrading techniques and negative public relations which result in injury to UPC and all franchisees,

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, it is hereby mutually agreed by and between the parties hereto that the Owner shall become a licensed franchisee of the Union Prescription Center at the location set forth hereinafter (herein called the "Prescription Center") on the following terms and conditions:

I. License of Registered Marks and Trade Name.

A. UPC hereby grants to the Owner for the term of this Agreement and any renewal thereof, a controlled and non-transferable personal license to (1) operate and conduct a Union Prescription Center in the location set forth hereinafter as well as the right to use the name "Union Prescription Center" as the name of the place of business that will be operated by the Owner under the terms of this Agreement, (2) to use the Union Prescription Center's service mark to identify the services and products of the Owner at the Prescription Center, and (3) to promote and advertise the Prescription Center under the name "Union Prescription Center", but in each case only with the logo, service mark or insignia prepared and submitted to Owner by UPC and in combination with such other color scheme, design, characteristics and words as are now or hereafter generally used by UPC.

B. The Owner shall operate, advertise and promote the Union Prescription Center only under the name "Union Prescription Center" without prefix or suffix and will not use the mark "Union Prescription Center" or any portion thereof or similar words as part of a corporate, partnership or other name or title. The Owner shall show his name (corporate, partnership or individual) in connection with the use of such licensed mark following "Union Prescription Center" in conjunction with the word "license" or otherwise identify himself as the owner of the Union Prescription Center under a license from UPC, on all invoices, statements, letterheads, prescription blanks and other printed matter, as well as on all signs posted on the Union Prescription Center premises. Applications for local licenses or other entries in public records will be made in the Owner's name.

C. The granting of the license hereunder shall not be construed in any way as a sale or assignment of the licensed trademarks or service marks of UPC or the proprietary interest that UPC has in the Union Prescription Center name, but UPC merely grants Owner a license to use said marks as well as the trade name Union Prescription Center, so long as the Owner complies with the terms, conditions and covenants of this Agreement. The use of the Union Prescription Center trade name in connection with the Owner's Union Prescription Center shall be required so long as the Owner operates a Union Prescription Center under this Agreement.

D. Upon the expiration or termination of this Agreement, for any reason whatsoever, the Owner shall immediately discontinue the use of all trade names, trademarks, service marks, signs, structures and forms of advertising indicative of the name Union Prescription Centers, its symbols, trademarks or service marks or its business or products. To the extent that Owner may lawfully do so, he shall make or cause to be made such removals or changes in signs, buildings and structures as UPC shall reasonably direct so as to eliminate the use of Union Prescription Center name by Owner. If after five (5) days Owner fails or omits to make or cause such changes to be made upon the request of UPC, then without prejudice to any other rights of UPC, UPC may enter upon the premises of the Owner, without being guilty of trespass or any other tort, and make, or cause to be made, such changes at the Owner's expense in order to protect the reputation and good name of UPC.

II. Initial Franchise Fee and Royalties.

A. Owner does hereby acknowledge that the execution of this Agreement and the granting of the license hereunder constitute the sole consideration for the payment of the sum of Fifteen Thousand Dollars ($15,-000) heretofore or herewith paid by Owner to UPC and that said sum shall have been fully earned by UPC upon the execution of this Agreement.

B. The Owner agrees to pay UPC a continuing monthly royalty in an amount equal to four and one-half percent (4½%) of the Owner's gross receipts (not including sales, use or service taxes or any taxes levied in lieu thereof) within twenty (20) days after the end of each calendar month, based on gross receipts for the month preceding.

C. The term "gross receipts" as used in the preceding paragraph shall include all cash receipts, receivables, property or other things of value obtained or derived from the operation of the Prescription Center whether derived from sales or any other source of any nature whatsoever, and shall include, but not be limited to, receipts generated from the sale of any merchandise or equipment whether or not related to drugs, medicine or medical care (provided, however, that nothing contained herein shall be construed as an authorization for the sale of any item at the Prescription Center other than the items permitted to be sold under the provisions of this Agreement). Any credits or refunds, merchandise returns or sales or insulin at cost shall be excluded from the computation of gross receipts.

III. Term of Agreement.

A. This Agreement and the license granted hereunder, unless terminated earlier under the provisions hereof, shall be and remain in full force and effect for a period of twenty (20) years from and after the date of the execution of this Agreement.

B. The Owner shall have the option of renewing this Agreement for an additional term of ten (10) years at the end of the initial term, providing, however, that: (1) Owner notifies UPC in writing at least one hundred and eighty (180) days prior to the expiration of the initial term that he intends to renew this Agreement; (2) the Owner is not at the time of the exercise of such option nor the commencement of the renewal term in default hereunder; and (3) the Owner, not later than one hundred and eighty (180) days prior to the expiration of the initial term executes and delivers to UPC the Franchise Agreement then in effect for new franchisees (without, however, reducing the primary market area of the Prescription Center or containing any requirement concerning the payment of any franchise fee or royalty beyond the requirements set forth herein).

IV. Business Location.

A. The Union Prescription Center of the Owner shall at all times be located in a place approved by UPC within the primary market area (see Control Data). The location of the premises to be used by the Owner shall be inspected and approved by UPC prior to the execution of any lease agreement respecting said premises. UPC

shall have the right to inspect the premises of the Prescription Center during normal business hours.

B. If the premises of the Prescription Center shall be leased by the Owner from a third party, the lease relating thereto shall be submitted to UPC for examination and approval prior to the execution thereof. Upon approval of such lease by UPC, no amendment, assignment or sublease shall be made or entered into by Owner without the express written consent and approval of UPC (language to this effect shall be included in the lease). The terms of such lease and any subsequent lease shall contain a provision calling for the assignment of the lessee's rights and interest in said lease to UPC (at the option of UPC) in the event of any default on the part of the Owner hereunder (whether or not Owner shall have defaulted under the provisions of said lease). Upon execution of such lease the Owner shall deliver to UPC either a conformed copy or photostatic copy of such lease together with a written assignment of such lease, suitable for recording, which shall be held by UPC as security for the faithful performance by the Owner of the covenants and conditions assumed by Owner under this Agreement.

C. Owner shall at all times maintain the exterior and interior of the Prescription Center premises in a clean, orderly and attractive condition and shall maintain all structures, furnishings, fixtures, equipment and decorations in such a manner as to insure an attractive appearance of the Prescription Center.

V. Area and Exclusivity of Operation.

A. The Prescription Center licensed hereunder has been assigned a primary market area which is more particularly described in Article XXIV hereof. To secure and protect the Owner, UPC will not establish another Union Prescription Center, regardless of how designated, within the primary market area assigned to the Owner during the term of this Agreement. Conversely, without the prior written consent of UPC, the Owner may not move his Union Prescription Center or establish another Union Prescription Center or any pharmacy business operation during the term hereof. The Owner may not operate any business, either directly or indirectly, other than that described herein from the subject location.

B. During the term hereof the Owner will not have an interest, direct or indirect, in the ownership, management, control or financing of any other retail drug business, pharmacy or medical equipment rental establishment except that (1) in the event the Owner on the date hereof owns, in conjunction with others, a pharmacy or retail drug establishment(s), which, due to such joint ownership with others, cannot be converted into a Union Prescription Center, or (2) in the event Owner on the date hereof owns an established pharmacy or retail drug establishment(s) which because of its location or physical characteristics cannot be converted to a Union Prescription Center, Owner may continue to participate in or hold ownership or management of such establishments, provided that (i) the Union Prescription Center established hereunder is totally separated from such other establishments for accounting, corporate, financial and managerial purposes, and (ii) none of the Union Prescription Center techniques, systems, practices, promotional materials or programs, inventory or equipment are transferred to or used by such other establishment. Schedule I attached hereto sets forth the location of all such establishments in which Owner is presently interested, and the nature and extent of such interest. In the event Owner, without the express written consent of UPC, acquires any interest, direct or indirect, in the ownership, management, control or financing of any other such drug business, pharmacy or medical equipment rental establishment (including ownership of stock in any such business or establishment which is not publicly traded) such acquisition shall constitute a default hereunder.

C. In the event the Owner hereunder is a corporation, partnership, joint venture or other business entity, the restrictions set forth in paragraph B above shall apply as

well to the principals, officers, directors, shareholders and/or partners of said corporation, partnership, joint venture or other business entity.

## VI. Adherence to National Standards.

A. UPC has established interior and exterior standard colors, lighting, design, equipment and fixtures, designed to create a pleasant, inviting atmosphere and appearance to and in the Union Prescription Center and to provide national identification.

B. Owner shall adhere to the standards and maintain a neat, orderly arrangement of displayed merchandise and a high degree of cleanliness in the Union Prescription Center. Any new construction must conform, subject to zoning restrictions, to UPC's standards. In any event, color scheme, decoration, facilities and equipment must conform to such national standards.

C. The Union Prescription Center is required to be operated under the provisions set forth in this Agreement as part of a national organization securing its strength through adherence to UPC's uniformly high standards of service, appearance, quality of equipment and proved methods of operation. Owner recognizes the necessity of the adherence to all such national standards and to the provisions of this Agreement and agrees to conform strictly thereto.

D. Owner acknowledges UPC's rights to and interest in its present and future distinguishing characteristics, and UPC's exclusive rights to such characteristics. These characteristics include the service mark "Union Prescription Center" and the Union Prescription Center logo, used in any form and in any design, alone or in combination and all present and future names, service marks, trademarks, trade names, insignia, slogans, emblems, symbols, designs or other characteristics used in connection with the Union Prescription Centers. Owner hereby acknowledges that these distinguishing characteristics have acquired a secondary meaning which indicates that the Union Prescription Center is operated by or with the approval of UPC.

E. To enable UPC to maintain the integrity of the Union Prescription Centers, UPC, during the term of this Agreement and any renewal thereof, shall have:

(1) The unqualified right to review the Union Prescription Center's operations periodically during each year and consult with the Owner from time to time on operating problems concerning the Union Prescription Center;

(2) The unqualified right, from time to time, to inspect the Union Prescription Center so as to assure maintenance of the high standards of the Union Prescription Center program, the goodwill of the public, and compliance with the provisions of this Agreement and with the various licensing laws.

## VII. Support of Organized Labor.

Owner hereby acknowledges that the sponsorship, endorsement and support of organized labor for the Union Prescription Center program is important to the continued successful operation of the Union Prescription Center licensed hereunder. In order to assist UPC in maintaining liaison with the appropriate agents of the sponsoring labor organizations, Owner hereby agrees to exercise his best efforts to insure that union members from local areas shall be engaged for all construction, repairs or remodeling work required at the Prescription Center licensed hereunder. Owner further agrees that all invoices, statements, letterheads, prescription blanks, advertising material or any other printed material of any nature whatsoever shall be printed in a "union shop" whenever possible. Owner shall exercise his best efforts at all times to effectively maintain the support of organized labor for the Prescription Center licensed hereunder.

## VIII. Inventory, Equipment and Fixture Requirements.

*A. Inventory Requirements.*

(1) UPC uniformly designates the nature and minimum inventory requirements for each Union Prescription Center subject to the approval of the Owner.

(2) UPC has made arrangements for the packaging and nationwide distribution of pharmaceutical items bearing the Union Prescription Center's label. If requested by Owner, UPC shall make these pharmaceutical items available to Owner provided, however, that Owner shall not be required to purchase any private label merchandise from any suppliers of UPC.

(3) Recognizing the importance of national uniformity in the Union Prescription Center program, Owner agrees that he will not add to the Union Prescription Center's inventory of merchandise or equipment, regardless of whether purchased or consigned, items not directly related to the proscription, convalescent, or medical field without the written consent of UPC.

(4) Owner will execute, deliver and maintain such inventory control data, delivery receipts and records as are prescribed by applicable law or regulation and such other inventory records as may be required by UPC.

*B. Equipment and Fixtures.*

UPC uniformly designates the equipment and fixtures for each Union Prescription Center. Owner, therefore, hereby authorizes UPC to order, on his behalf, furniture, fixtures and equipment required, in the sole judgment of UPC, to commence the Union Prescription Center business at the location specified herein. Said furniture, fixtures and equipment shall be paid for by Owner who shall have been advised of the approximate total cost of such items prior to the ordering thereof.

IX. Hours and Operation.

Owner shall commence operation of the Union Prescription Center business on the Opening Date (see Control Data) except where prevented by reason of an incomplete building or other conditions beyond his control, and shall thereafter keep the Union Prescription Center open for business at least forty-six (46) hours per week.

X. Accounting System, Records and Forms.

A. UPC specifies and Owner shall use standard forms to be used in the operation of the Prescription Center including, but not limited to, prescription labels, prescription files, rental contracts, letterheads, business cards, accounting and inventory records.

B. It is hereby recognized by and between the parties hereto that it is in their best interests for the Owner to use a uniform accounting system and to make monthly financial reports based thereon in order that UPC may be able to disseminate helpful information to its other franchisees, evaluate the relative operating performance of each franchisee, and develop criteria that will enable UPC to continue to formulate plans and policies in the best interest of each franchisee and enable each franchisee to obtain the most satisfactory results from its business. In this regard, Owner shall install, maintain and use the standard UPC Accounting System, including, but not limited to, the standard chart of accounts and reports. Owner shall furnish UPC a true copy of each monthly financial statement within sixty (60) days of the close of each month.

C. The Owner will establish and maintain an inventory control system and will schedule an annual or semi-annual physical inventory date with a professional inventory service at least ninety (90) days in advance of the desired inventory date. These inventories shall be documented on forms acceptable to the Internal Revenue Service, and one copy shall be mailed to UPC no later than the morning following the date on which the inventory report is received.

D. Owner shall be required to forward to UPC, within forty (40) days after the close of each calendar quarter, evidence satisfactory to UPC that all required taxes have been paid for the quarter, including, but not by way of limitation, social security taxes, income taxes, state sales and use taxes, and state unemployment taxes.

E. Annually, and within ninety (90) days after the close of the Owner's accounting

period, Owner shall be required to send to UPC evidence satisfactory to UPC indicating that all tax returns have been filed and the taxes paid; these tax returns shall include, but shall not be limited to, required payroll tax returns, federal and state tax returns, and any required local tax returns.

F. Owner shall keep and preserve during the full term of this Agreement and any renewal thereof, complete records of all sales and purchases, in a manner and form prescribed by UPC.

G. Owner shall permit UPC's representatives (at UPC's expense) to examine and audit the records and books of Owner at any reasonable time. Should said audit reflect any underpayment by Owner of the monthly royalty fees required to be paid hereunder of One Hundred Dollars ($100) or more, Owner shall be required to pay UPC for the reasonable costs of said audit and the expenses incurred in conjunction therewith.

XI. Insurance.

A. Owner shall maintain and carry comprehensive general liability insurance, including products and personal injury coverage, in minimum amounts of $100,000—$300,000—$100,000. Owner shall also be required to maintain and carry pharmacists' professional liability insurance in a minimum amount of $300,000. Owner further agrees to carry fire, extended coverage, vandalism and malicious mischief insurance on the contents, merchandise, furniture, fixtures, improvements and betterments in the Union Prescription Center in an amount equal to no less than the cost of such equipment and leasehold improvements in the Union Prescription Center. Owner also agrees to carry workmen's compensation insurance coverage as required by any state or federal authority. The insurance policies required to be maintained by Owner shall name UPC as an insured as its interests may appear. Owner shall obtain the aforementioned insurance coverage on or before the earliest possible date on which the Owner is exposed to any liability of any nature whatsoever relating to the Prescription Center.

B. UPC has made arrangements to provide the aforementioned insurance coverage to the Owner, at the expense of Owner, payment for which shall be made directly to the insurance carrier. In the event Owner does not desire to take advantage of this service provided by UPC, Owner may purchase such insurance from a company acceptable to UPC, so long as the said insurance policies name UPC as an additional insured and UPC is provided with certificates of insurance setting forth limits of liability in the same amount as that insurance made available by UPC. In the event Owner does not provide UPC with certificates of insurance satisfactorily establishing the existence of the coverage required hereunder on or before the date on which such coverage must be obtained, UPC may purchase such insurance to protect the interests of the parties and the costs and charges shall be paid by Owner.

C. Owner hereby agrees that the required insurance policies referred to herein will be canceled or cancelable by Owner only after at least twenty (20) days advance notice in writing to UPC of the intended cancellation thereof. The Owner shall furnish all insurance policies to UPC stamped "paid", or in lieu thereof, acceptable insurance certificates shall be delivered to UPC. All of said insurance policies shall provide that no policy shall be canceled or amended without first giving UPC twenty (20) days previous written notice of such cancellation or amendment. In the event of any cancellation or amendment, Owner shall immediately deliver to UPC a replacement for any such policy thus canceled or amended.

XII. Advertising.

A. UPC has developed an effective Launch Program for introducing the Union Prescription Centers. Owner hereby agrees to pay for the expenses involved in the Launch Program for the Prescription Center, the approximate cost of which (exclusive of the cost of prescriptions) shall be approved by Owner prior to the Opening Date. Such expenses for the Launch Pro-

gram shall include, but shall not be limited to, artwork, mechanical cost, printing, postage and free prescriptions.

B. Owner shall be required to pay for the cost of all displays, promotional material and advertising campaigns furnished to and used by Owner for the Prescription Center licensed hereunder. Owner shall utilize such displays, promotional material and advertising campaigns without alteration as prepared and provided by UPC to Owner.

C. Owner shall be required to utilize insignia, equipment, decals, personnel uniforms, truck signs and colors, indoor signs and posters, and such other advertising and promotional materials as may be required by UPC to maintain uniformity of appearance, national recognition, point of purchase impact and full penetration of promotional opportunities.

D. Owner shall be required to use the standard Union Prescription Center sign or signs as specified by UPC. The initial cost of said sign or signs and the installation thereof as well as the cost of maintenance of the sign or signs shall be borne by Owner. Owner shall be advised of the approximate cost of said signs prior to the ordering and installation thereof.

E. Owner shall be required to submit to UPC for written approval prior to printing and the distribution or dissemination thereof, any advertisements, script, direct mailings, or any other advertising or promotional material of any nature whatsoever which is part of any advertising campaign that has not been developed by UPC. UPC shall then, within fifteen (15) days of the receipt of such materials, advise Owner of its approval or disapproval of said materials in writing. Owner may deem any such submission approved in the event that no notice of disapproval is received within said fifteen (15) day period. Owner further agrees to refrain from using, and to withdraw or modify, any advertising or promotional material which in the sole judgment of UPC conflicts with any national advertising policies of UPC, or is not in keeping with the high ethical and professional standards of the Union Prescription Center pro-

gram or is in any way harmful or detrimental to UPC or the Union Prescription Center program.

F. Owner hereby acknowledges that from time to time federal or state regulating agencies or state boards of pharmacy as well as local governments may impose restrictions on advertising used for the promotion of the Union Prescription Centers, and in such event, Owner hereby agrees to comply with any regulations or orders that may be imposed. Owner shall immediately, in writing, notify UPC of any restrictions, changes or demands sent to or made upon Owner by any regulating agency, or federal, state or local governmental unit with regard to any advertising or promotional campaigns.

G. During the term of this Agreement and any renewal thereof, Owner shall participate in any local or regional advertising or promotional campaigns subscribed to by a simple majority of the Union Prescription Centers located within the geographical area covered by such advertising or promotional campaign initiated subsequent to the Opening Date of the Prescription Center licensed hereunder. In such event, Owner hereby agrees to pay a proportional part of the cost and expenses of such advertising or promotional campaigns, as determined by UPC to be fair and equitable to the franchisees and others participating in such programs. Owner further agrees to honor any promotional or discount coupons incorporated into any such advertising or promotional campaigns.

H. Owner shall conduct its business in a manner that will reflect favorably at all times upon UPC and the Union Prescription Center program, and the good name, goodwill and reputation thereof. Owner shall avoid any deceptive, misleading, or unethical practice or advertising that is or might be construed to be detrimental to the good name, goodwill or reputation of other Union Prescription franchisees.

I. Owner shall pay his pro-rata share of the cost of any telephone book advertising in cities with more than one franchisee, which costs shall be apportioned equally

among all the Union Prescription Center franchisees listed in such advertising.

J. Owner shall indemnify UPC and hold it harmless against any liability or liabilities of any nature whatsoever arising out of the use by Owner of any advertising or promotional material which has not been prepared or developed by UPC. UPC hereby disclaims liability of any nature whatsoever to Owner arising out of the use by Owner of any advertising or promotional material which has been prepared or developed by UPC.

XIII.  Licenses, Taxes and Business Expenses.

A. The Owner will secure all licenses, permits or other consents required by any governmental or regulatory agency and shall operate the Union Prescription Center business in conformity with all applicable laws, ordinances, administrative regulations and any other governmental requirements. The Owner shall promptly pay, when due, all expenses of the Union Prescription Center, including all taxes and assessments and any sales, use, or like taxes payable on or by virtue of the operation of the Prescription Center licensed hereunder.

B. Owner will, in the interest of maintaining a sound business reputation, pay promptly when due, all wages, invoices or other charges pertaining to the operation of the Prescription Center as well as all royalties, insurance premiums, advertising assessments or any other charges of any nature whatsoever which are due and payable to UPC.

C. In the event any royalties or other charges which are due and payable to UPC are not paid when the same are due and owing, UPC shall be entitled to charge Owner with the maximum interest under the applicable state laws on the delinquent royalties or amounts which have not been paid to UPC.

XIV.  Prohibited Disclosures.

·The Owner hereby acknowledges that the materials, compilation of information, methods of business operation and other elements of the Union Prescription Center's program now and hereafter provided or revealed to Owner by UPC under and pursuant to the terms of this Agreement constitute trade secrets of UPC, revealed in confidence hereunder and that no right is given or acquired to duplicate these trade secrets or the Union Prescription Center program or any portion thereof at any time without the express written consent of UPC. Owner agrees that during the term of this Agreement and thereafter, he will not communicate or divulge to or use for the benefit of any person, corporation, partnership or joint venture or any other entity of any nature whatsoever, any information or knowledge concerning the business of UPC and the operation of the Union Prescription Centers which he may acquire by virtue of his operation of the Prescription Center licensed hereunder and that he will not disclose to anyone, other than authorized employees of UPC, any information, trade secrets or procedures of UPC. Owner further agrees that during the term of this Agreement and thereafter, he will not do any act that will in any way be prejudicial or injurious to the best business interest or goodwill of UPC. Owner hereby covenants and agrees to keep and respect the confidential matters hereunder reposed.

XV.  Termination on Default.

It is agreed that UPC may immediately terminate this Agreement and the license granted hereunder as well as all other rights granted to Owner hereunder (subject to any notice or grace period requirements contained herein) in the event of any of the following (which shall be considered "defaults" on the part of Owner):

(1) Owner is declared or becomes insolvent or bankrupt; makes an assignment for the benefit of creditors; or a receiver is appointed or proceeding is commenced therefor, by or against Owner, under state law or any provisions of the federal bankruptcy law or amendments thereto, and if involuntary, such proceeding is not dismissed within thirty (30) days of the filing thereof;

(2) Owner, if a corporation or partnership, is dissolved, liquidated or terminated, or, after a merger or consolidation, is not the successor corporation or partnership having at least a majority of the same shareholders or partners and equity control as before such merger or consolidation;

(3) Owner sells or leases the business (such sale or lease to encompass the disposition of fifty percent (50%) or more of the shares having voting, or partnership interest having policy control) without first having complied with the requirements respecting the right of first refusal extended UPC as set forth in Article XVIII below;

(4) Owner breaches any of the provisions of this Agreement or any other agreement between Owner and UPC, including the failure of Owners to make any royalty or promissory note payments, if any, to UPC when the same are due and owing to UPC. In the event UPC shall determine that Owner is in default pursuant to this paragraph, UPC shall provide Owner with a written notice of such default and Owner shall be given a period of ten (10) days from the receipt of such written notice to correct any such breach and cure any such default.

## XVI. Remedies of UPC.

A. Within ten (10) days after the termination of this Agreement by lapse or for any other cause of any nature whatsoever, Owner hereby agrees to immediately discontinue the operation of the Prescription Center at the subject location and the use of all trade names, service marks, trademarks, signs, structures, rental forms and advertising relating in any way to the operation of the Prescription Center. All of the Owner's right as a licensee shall terminate and he shall thereafter cease to use by advertising or otherwise the franchise, the Union Prescription Center program or any parts thereof, or any devices, marks, service marks, trademarks, trade names, systems, slogans or symbols used in connection with the Union Prescription Center program, including the Union Prescription Center name in any manner whatsoever.

B. UPC, at its option, shall immediately upon termination have the right to take possession of the Prescription Center. In the event UPC intends to exercise the option granted to it hereunder, Owner shall turn over to UPC or its designee a complete list of the names and addresses of all persons employed by Owner during the three (3) years immediately preceding termination, together with employment files, all prescription lists and files, and all other records of the Union Prescription Center business. Owner shall bring about a complete and effective transfer of the business, customers, facilities, services and employees to UPC or its designee. Owner shall pay all debts owing to UPC. Owner shall pay all of its debts arising out of the operation of the Prescription Center up to and including the date of the termination hereunder. In the event that UPC exercises its option hereunder, the reasonable liquidation value of the fixtures and inventory (over and above any existing liens, debts or encumbrances) shall be credited against any amounts due to UPC by Owner, and any excess shall be paid to Owner.

C. The Owner shall return to UPC in good condition, all manuals furnished by it, all advertising material, stationery and printed forms, prescription blanks and all other matter of any nature whatsoever furnished by UPC relating to the operation of the Prescription Center which is in possession of the Owner at the time of such termination regardless of whether UPC exercises the option granted to it under the preceding paragraph. Owner hereby authorizes UPC to promptly direct the telephone company to transfer Owner's telephone numbers and listings for the Union Prescription Center business to any other entity designated by UPC, or to completely discontinue the use thereof upon the direction of UPC.

D. If Owner fails to comply with the provisions of this Article, then UPC shall be entitled to recover from Owner as liquidated damages twenty percent (20%) of Own-

er's gross receipts thereafter as long as Owner continues to violate any of the provisions of this Article. The recovery of such liquidated damages hereunder shall not be exclusive and shall not preclude UPC from obtaining any other appropriate equitable and legal relief against the Owner, including a judgment for the actual damages sustained by UPC.

E. In the event of any default by Owner hereunder, UPC shall also have the right, in addition to any other remedies available at law or in equity, to terminate Owner's rights under this Agreement, and to enjoin him from further operation of the Prescription Center hereunder and the use of the Union Prescription Center name or any other name incorporating the Union Prescription Center concept or any similar concept or name.

F. Owner hereby agrees that UPC shall be entitled to damages for any breach by Owner of the provisions of this Agreement and that UPC may obtain immediate injunctive relief against Owner without bond and without notice. In addition, Owner acknowledges that UPC may specifically enforce the provisions of this Agreement against Owner, and pursue any other remedies, in law or in equity, and obtain such other relief to which UPC may be entitled as a result of the breach of any provisions of this Agreement by Owner.

## XVII. Restrictive Covenant.

The Owner agrees that he, his wife, children, parents or other relatives or any corporation or entity in which he, she or they have any interest, and the principals, officers, directors, investors, shareholders or partners if the Owner is a partnership, corporation, joint venture or other business entity (as well as any other entity of any nature in which any of the foregoing have any interest) shall not directly or indirectly engage or be financially interested in nor associated in any way with any retail prescription business within the primary market area of the Prescription Center licensed hereunder, or within any other primary

market area within which a Union Prescription Center is located (except and strictly as an employee with no financial interest or participation of any kind) for so long as this Agreement shall be in effect and for a period of one (1) year thereafter.

If any covenant or other provision of this Article is invalid or unenforceable by reason of any rule of law or public policy, this Agreement and, in particular, this Article, shall be deemed amended to comply with the relevant judicial construction placed thereon and to the extent that any provision is deemed invalid or unenforceable but may be valid or enforceable by limitation thereof, then such provision shall be enforceable to the fullest extent permitted under the law of the jurisdiction in which enforcement is sought; and if any particular provision is held to be invalid, illegal or unenforceable, all of the other covenants and provisions of this Agreement shall, nevertheless, remain in full force and effect and no covenant or provision shall be deemed dependent upon any other unless so expressly provided herein. In view of the confidential nature of UPC's business, the Owner consents to the issuance of an injunction enjoining the operation of any competitive business in violation of the terms of this Agreement. The Owner further agrees not to divulge to any third party or to use for any purpose other than the operation of the Prescription Center, any data, customer or employee names and addresses, techniques, advertising materials, or any other information of whatever nature or kind used or obtained in connection with the Prescription Center licensed hereunder.

## XVIII. Transfer; Right of First Refusal; Approval of Subsequent Owner.

A. Should the Owner at any time hereafter receive a bona fide offer for the purchase of all or a substantial part of the Union Prescription Center (meaning fifteen percent (15%) or more of the assets thereof), or, if the Owner is a partnership or corporation, an offer to purchase such percentage of partnership interest or shares as would constitute an aggregate change of

fifteen percent (15%) or more from the ownership obtaining as of the date hereof, UPC shall be promptly advised in writing as to the terms and conditions of such bona fide offer and the name of the prospective buyer; and thereafter UPC shall have the prior right to purchase said business, assets, or interests therein subject to such offer on the same terms within a period of thirty (30) days following the date of receipt of such notice. Should UPC elect to purchase within said period, it shall give written notice thereof and consummate such purchase not later than thirty (30) days after the date of the affirmative election. If, however, UPC fails to give such notice or rejects such right of first refusal within said thirty-day period, Owner shall be free, subject to the limitations set forth herein, to consummate said sale and purchase to said proposed buyer at any time within forty-five (45) days thereafter upon the terms and conditions no less favorable to the Owner than those specified in the terms of the offer received by UPC. If for any reason such sale is not consummated within such forty-five-day period, such right of first refusal shall again obtain and no subsequent sale shall be made except pursuant to the terms hereof. This right of first refusal shall again apply upon each and every successor to or assignee of the Owner including bona fide purchasers. Each and every successor shall be bound by all of the terms and conditions hereof. Notwithstanding anything to the contrary in this Agreement expressed, each successor shall be obligated to and does expressly assume all obligations of Owner under this Agreement by a writing furnished for such purpose by UPC.

B. Upon the death of the Owner, UPC is hereby granted the right, in the event it so desires, to take over and provide for the temporary operation of the Prescription Center during the administration of the Owner's estate. UPC is hereby granted the option to purchase the Union Prescription Center business from the executor, administrator, trustee or personal representative of the Owner.

C. In any event, and notwithstanding the foregoing, UPC reserves the prior right to approve any proposed successor to or assignee of the Owner, but the approval of UPC may not and will not be arbitrarily or unreasonably withheld. Any sale made without such approval shall be an event of default by the Owner hereunder, entitling UPC to pursue any and all remedies available to it upon Owner's default. Any permitted successor of Owner shall expressly assume and become bound by the terms and conditions set forth in this Agreement.

XIX. Security Interest.

In order to secure Owner's obligations to UPC, whether arising hereunder or under the provisions of any other agreements between the parties hereto, Owner hereby grants to UPC a first security interest in all of the Owner's inventory, furniture, merchandise, wares, supplies, equipment, tools of trade, signs, leasehold improvements and prescription files obtained for use in the Prescription Center, whether now owned or hereinafter acquired. Owner hereby agrees to execute such Uniform Commercial Code financing statements including any and all assignments, renewals and extensions thereof as UPC deems reasonably necessary from time to time.

XX. Indemnification.

Owner agrees that he will forever protect, save, and hold harmless, indemnify and agree to defend UPC from and against any and all losses, damages, demands, judgments, suits, penalties, expenses, attorneys' fees and any other liability or liabilities of any nature or of any kind whatsoever arising, directly or indirectly, out of or in connection with the operation of the Prescription Center licensed hereunder or arising out of any act of omission or commission on the part of the Owner, or any of its officers, directors, agents, servants and employees. Owner agrees at his own cost, expense and risk, to defend any and all actions, suits or other legal proceedings that may be brought, commenced or instituted against UPC and/or the Prescription Center for such claim or demand, and to pay or satisfy

any judgments that may be rendered against UPC and/or the Prescription Center in any such action, suit or legal proceedings.

## XXI. Arbitration.

UPC and Owner hereby agree that any and all disputes which may arise in connection with the construction or application of this Agreement shall be resolved and determined by arbitration. Such arbitration shall be instituted by filing NOTICE OF DEMAND FOR ARBITRATION upon the other party at which point one arbitrator shall be appointed by UPC, a second arbitrator shall be appointed by Owner and a third arbitrator selected by the two appointed arbitrators. If the two appointed arbitrators are unable to agree upon a third arbitrator after ten (10) days written notice from one to the other, then the third arbitrator shall be selected by the American Arbitration Association, or any successor thereto, upon the application of either appointed arbitrator. Arbitration proceedings shall be conducted in accordance with the rules of the American Arbitration Association then prevailing, and shall be held in Milwaukee, Wisconsin, or wherever else the parties agree upon. The decision of the majority of the arbitrators shall be binding and conclusive upon the parties and judgment thereon may be entered in any court having jurisdiction thereof. Arbitration under the provisions of this Article shall be a condition precedent to any legal or equitable right of action of any party hereto, except that no party shall be barred from obtaining equitable relief temporarily restraining the violations by another party of any of the provisions of this Agreement pending the decision of the arbitrators where a right to such relief is specifically granted herein. This requirement of arbitration shall not apply to and shall not be a prerequisite to any action on the part of UPC to recover amounts due from Owner or to actions by UPC pursuant to the provisions of Article XVI hereof.

## XXII. Notice.

All notices provided for herein shall be deemed given if in writing and delivered personally or by certified mail, postage prepaid, return receipt requested, and addressed to UPC or Owner, respectively, at their addresses as shown in this Agreement, or to such other addresses as either party may from time to time designate by notice.

## XXIII. Miscellaneous.

It is further agreed by the parties hereto that:

A. Failure of UPC to insist upon strict compliance with any of the terms, covenants and conditions of this Agreement shall not be construed as a waiver or release of UPC's right to insist upon such compliance and no custom or practice of the parties in conflict with the terms hereof shall constitute a waiver of UPC's right to demand strict compliance with the terms hereof.

B. The remedies set forth in this Agreement in favor of UPC shall not be exclusive but shall be cumulative, and in addition to all other rights and remedies.

C. This document contains the entire Agreement of the parties and supersedes any oral or written representations, inducements, or promises not contained herein and may not be modified except in writing signed by the party against whom enforcement is sought.

D. They are not and shall not be considered joint venturers, partners or the agents of each other, and neither party shall have the power to bind or obligate the other except as provided herein.

E. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of UPC and upon permitted successors and assigns of the Owner, including his executor, administrator, trustee, or personal representative. Expiration by lapse of time or earlier termination of this Agreement shall not affect continuing covenants, duties and obligations contained herein, nor the indemnity provided in Article XX, all of which remain effective and

**810**

binding subsequent to the termination of this Agreement for any cause.

F. All words used herein in the singular number shall extend to and include the plural and similarly, all words in the plural number shall extend to and include the singular. All words used in any gender shall extend to and include all genders.

G. Time is of the essence of this Agreement.

H. If any covenant or other provision of this Agreement is invalid or unenforceable by reason of any rule of law or public policy, this Agreement shall be deemed amended in such a manner so as to delete therefrom the covenant or provision so held to be invalid or unenforceable; and to the extent that any provision is deemed invalid or unenforceable but may be valid or enforceable by limitation thereof, then such provision shall be enforceable to the fullest extent permitted under the law of the jurisdiction in which enforcement is sought; and if any particular provision is held to be invalid, illegal or unenforceable, all of the other covenants and provisions of this Agreement shall, nevertheless, remain in full force and effect and no covenant or provision shall be deemed dependent upon any other unless so expressly provided herein.

I. This Agreement shall be interpreted, construed and governed under and by the laws of the state of Wisconsin.

J. This Agreement shall not become effective or binding upon UPC until executed by UPC by its duly authorized officers at its office at Milwaukee, Wisconsin.

XXIV. Control Data.

A. The Prescription Center licensed by this Agreement will be located at 800 Penn St., City of Reading, County of Berks, State of Pennsylvania.

B. The Opening Date of the Prescription Center is approximately October 1, 1974.

C. Personal participation of key individuals: The individual(s) referred to in this Agreement is (are) Joseph J. Todisco, Jr.

D. The primary market area of this Prescription Center is the following area; Berks County, Pennsylvania.